Ex parte Samuel Richmond
WALKER, Applicant.

No. WR–73965–04.

Court of Criminal Appeals of Texas.

March 12, 2014.

Samuel Richmond Walker, Rosharon,
TX, for Appellant.

Devon Anderson, District Attorney Harris County, Houston, Lisa C. McMinn,
State's Attorney, Austin, TX, for the State.

PRICE, J., filed a concurring statement
in which KELLER, P.J., joined.

I concur with the Court's denial of relief
in this application for a writ of habeas
corpus. I write separately to address
some of the concerns raised by Judge Alcala in her dissenting statement. I express no opinion as to whether, in the
words of the dissenting statement, "[h]ad
defense counsel objected to the back-door
hearsay elicited at trial by the State, the
trial court would have erred by permitting
the evidence."[1] But even assuming *arguendo* that it would have, I do not think
that the applicant has met his burden to
prove that his counsel on retrial performed
deficiently—nor that, assuming his representation was deficient, such deficiency
prejudiced the applicant.

### 1. Deficient Performance

In concluding that counsel retained by
the applicant for his robbery retrial performed deficiently by failing to object on
hearsay and Confrontation Clause grounds
to the testimony of Detective Parinello, the
dissent seems to place great weight on the
fact that initial counsel's overruled Confrontation Clause objections resulted in a
reversal of the applicant's first conviction
on appeal.

But "[e]ven the best criminal defense
attorneys would not defend a particular
client in the same way"—and indeed,
"[t]here are countless ways to provide effective assistance in any given case."[2] It
is not our task, in other words, to undertake an apples-to-oranges-like comparison
of "Trial Strategy No. 1" to "Trial Strategy No. 2" and determine which strategy
we think preferable.[3] Instead, our task is
simply to fairly determine whether subsequent counsel's strategic decision was
"reasonable considering all the circumstances"[4]—or, alternatively, whether counsel committed an "error[ ] so serious that
[he] was not functioning as the 'counsel'
guaranteed the defendant by the Sixth
Amendment."[5] When we make this determination, we are to bear in mind that "[a]
fair assessment of attorney performance
requires that every effort be made to eliminate the distorting effects of hindsight, to
reconstruct the circumstances of counsel's
challenged conduct, and to evaluate the
conduct from counsel's perspective at the
time" the decision was made.[6]

---

1. Dissenting Statement at 276.

2. *Strickland v. Washington,* 466 U.S. 668, 689, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

3. *See, e.g., Ex parte Ewing,* 570 S.W.2d 941, 944 (Tex.Crim.App.1978) ("The fact that another attorney may have pursued a different tactical course of trial is insufficient to support a finding of ineffective assistance of counsel.").

4. *Strickland,* 466 U.S. at 688, 104 S.Ct. 2052.

5. *Id.* at 687, 104 S.Ct. 2052.

6. *Id.* at 689, 104 S.Ct. 2052.

Furthermore, and perhaps most relevant to the question before us, "[s]trategic choices made after thorough investigation of law and facts relevant to plausible options are *virtually unchallengeable.*"[7] The Fifth Circuit has said, in this context, that when counsel makes a "conscious and informed decision on trial tactics and strategy," that decision should not be deemed to be constitutionally deficient unless it was "so ill chosen that it permeates the entire trial with obvious unfairness."[8] This Court has, in addition, noted that when important trial decisions are made for "strategic reasons," the fact that those decisions would seem "risky" or "undesirable to most criminal attorneys" will not suffice to establish deficient performance under *Strickland.*[9] It is only when *"no reasonable trial attorney would pursue such a strategy under the facts of th[e] case"* that this Court may grant relief for an unreasonable strategic decision that was made after deliberation and under advisement.[10]

Judging by some of the considerations it identifies as supporting the conclusion that counsel's performance was objectively unreasonable, the dissenting statement fails to pay full and proper heed to the Supreme Court's admonition regarding the "distorting effects of hindsight." Specifically, in its discussion of counsel's alleged deficiencies, the dissent finds it significant that "[t]he State ran with [Parinello's] hearsay, essentially arguing in its closing

statement that the probability that applicant did not commit this offense was one in four million."[11] The dissent also concludes from a review of the record that "the jury gave significant weight to Dangerfield's statements that 'Low Down' gave her the complainant's stolen property."[12] But each of these considerations is utterly irrelevant in determining the extent of counsel's deficiency as of the time of his decision. Of course, we *now* know that counsel's trial strategy failed—his client was, after all, convicted. However, we cannot say on the basis of *either* of these considerations that his strategy was *ex ante* unreasonable.

Focusing on the consideration that *is* relevant to the issue of whether or not counsel performed deficiently—that counsel chose not to object on hearsay or Confrontation grounds despite his knowledge of former counsel's (ultimately vindicated) decision to do so—I conclude that the applicant has failed to carry his burden to prove that counsel's decision was "so ill chosen" as to "permeate[ ] the entire trial with ... unfairness."[13] The applicant does not point to anything in the record that suggests that counsel's strategy (which was, apparently, to suggest that the State went down a "rabbit trail" in investigating the applicant when it relied upon the "ridiculous" story provided by a self-serving arrestee) was illogical, implausible, or patently doomed from the outset to failure. He does not argue it would be

---

7. *Id.* at 690, 104 S.Ct. 2052 (emphasis added).

8. *E.g., Pape v. Thaler,* 645 F.3d 281, 291 (5th Cir.2011).

9. *Ex parte Ellis,* 233 S.W.3d 324, 331 (Tex. Crim.App.2007).

10. *See id.* (emphasis added) ("[T]rial counsel's strategic reasons [for offering otherwise inadmissible evidence] were not unreasonable [because] [a]lthough the defensive course chosen

by counsel was risky, and perhaps highly undesirable to most criminal defense attorneys, we cannot say that no reasonable trial attorney would pursue such a strategy under the facts of this case.").

11. Dissenting Statement at 279.

12. *Id.* at 279.

13. *Pape,* 645 F.3d at 291.

unreasonable for an attorney, in the exercise professional judgment, to think that the identification testimony of the complainant's son, if potentially questionable, might still be enough to convince a jury to convict—and that in order to counter this evidence, it would be necessary to proactively suggest that the State had investigated and implicated the wrong man. And he does not explain why it is that *no* reasonable trial attorney would conclude, as did counsel, that the rewards of such an approach *might* outweigh the risks—nor why a miscalculation in this regard would constitute an "error[ ] so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." [14]

Instead, the applicant (rather conclusorily) states that his counsel "knew or should have known" to object to the hearsay testimony, given the outcome of the applicant's first direct appeal. But this bare assertion effectively begs the question: *Given that* counsel knew the testimony was objectionable, was it nevertheless unreasonable for him to make the decision to admit it without objection? [15] The applicant fails to explain why it was. In light of this, I cannot conclude that the applicant has carried his burden to prove by a preponder-

ance of the evidence that his attorney's conduct fell below an "objective standard of reasonableness." On this basis alone, I would concur with the Court's decision to deny this application for writ of habeas corpus.

## 2. Prejudice

But I also believe that the Court's decision to deny relief on the applicant's ineffective-assistance claim is justified by the applicant's failure to show prejudice. The dissenting statement identifies three considerations that would arguably support a finding that the applicant suffered prejudice at the hands of his trial counsel: (1) counsel's claim that he "spoke with at least two jurors who told [him] that [Parinello's] testimony was the deciding factor in convicting" the appellant [16]; (2) that the jury "requested and was permitted to review Parinello's testimony that the computer database matched applicant to 'Low Down[ ]' " [17]; and (3) that the only evidence to link the applicant to the offense (aside from the objectionable hearsay testimony) was the "unreliable" identification by the complainant's son.[18] Respectfully, I do not think that these considerations suffice to establish by a preponderance of the evidence that there is a "reasonable proba-

---

14. *Strickland,* 466 U.S. at 687, 104 S.Ct. 2052.

15. The dissent points to counsel's objections to Parinello's testimony regarding the applicant's and Noralva Ramos's aliases in an effort to cast counsel's invocation of strategy as a *post hoc* rationalization. *See* Dissenting Statement at 13–15. But trial counsel's objections were not inconsistent with the strategy he now invokes. Counsel objected to the State's introduction of the applicant's database-provided alias, and deliberately withheld objection when the State elicited testimony as to the more questionable aspects of Parinello's investigation. Indeed, in an attempt to exploit this weakness in the State's case, counsel elicited from Parinello the fact that

his investigation arguably involved crediting the finger-pointing of a drunk with stolen property in her purse. It is not inconsistent with counsel's presently-invoked strategy (*i.e.,* exposing the absurdity of the State's investigation) that he should wish to exclude, on hearsay grounds, the fact that a computer search would turn up the applicant's alias and yet simultaneously seek to present to the jury the fact that the State had pursued an investigation on the basis of a less-than-credible lead.

16. Dissenting Statement at 276.

17. *Id.* at 275.

18. *Id.* at 281.

bility" that the verdict would have been different absent counsel's decision to allow Parinello's testimony without objection.

As to the first of these considerations, I note that we are never to take these kinds of juror impact statements into account in determining the legality of a conviction.[19] Difficult though it may be to unring this bell, the Rules of Evidence make clear that we are not to consider *any* statement by a juror as to the "effect of anything on any juror's mind or emotions or mental processes, as influencing any juror's assent to or dissent from the verdict or indictment." [20] As to the second of these considerations, I am not convinced that the fact that the jury requested to review Parinello's testimony cuts in favor of *either* conclusion (that is, that the applicant was either prejudiced or not prejudiced). All we know is that the jury requested to review this testimony; we do not know that this request was made so that the jury might weigh the testimony in favor of conviction. It seems to me that any further claim about the import of the jury's request is largely speculative—and is, as a result, not particularly probative.

With respect to the sole consideration that *is* probative as to prejudice (*i.e.*, the balance of the evidence aside from the out-of-court identification), I note that the jury was presented with conflicting accounts of Erik's relative levels of confidence in his identification of the applicant and his ability to recall the numbers of the license plate. On direct examination of the circumstances under which he attempted to ascertain the license plate of the getaway car, Erik testified as follows: "I got—I think I got the last two numbers and my brother got like the first four numbers or the first letters or numbers." On cross-examination, Erik responded affirmatively to the following question by defense counsel: "When you chased after the vehicle, you and your brother, and *you got the partial license plate* and wrote it down, were you sure that that was the right number?" [21] While this portion of the record is arguably consistent with the notion that Erik's "certain" identification of the applicant was just as questionable as his "certain" recall of the license plate, it is also consistent with the notion that Erik was certain of the portion of the license plate that he—rather than his brother—was able to recall. And given that Detective Parinello never testified as to which characters of the license-plate number were inconsistent with the actual license plate of the red Ford Focus, the jury was never actually given any indisputable evidence that the portion of the license plate that Erik provided *was* wrong.

In other words, the jury *could* have reasonably inferred exactly what the dissenting statement apparently concludes:

---

**19.** *See* Tex.R. Evid. 606(b) ("Upon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement occurring during the jury's deliberations, or to the effect of anything on any juror's mind or emotions or mental processes, as influencing any juror's assent to or dissent from the verdict or indictment. Nor may a juror's affidavit or any statement by a juror concerning any matter about which the juror would be precluded from testifying be admitted in evidence for any of these purposes."); *Ex parte Parra*, 420 S.W.3d 821, 827 (Tex. Crim.App.2013).

**20.** *Id.* To make matters worse, we do not, strictly speaking, yet have before us a statement *by a juror* as to any matter affecting his or her decision to vote "guilty." We have a sworn statement from counsel relaying the gist of two jurors' comments to him. Ironically, then, in the course of expressing his (by all appearances, quite sincere) contrition for failing to object to hearsay at the applicant's trial, counsel presents us with statements that arguably *themselves* constitute hearsay. *See* Tex.R. Evid. 801.

**21.** (emphasis added).

that Erik's identification of the applicant was both "shaky" and "unreliable."[22] But it was not bound to make that inference. It could just as reasonably have inferred that Erik's identification of the applicant was in no way tarnished by the fact that the license-plate number provided to the detective by Erik and his brother turned out to be wrong. On the face of this record these inferences stand in equipoise. That being the case, and given that it is the *applicant* who bears the burden to prove prejudice by a preponderance of the evidence, this equipoise bodes poorly for the applicant's claim—it means that the

possibility that the jury discounted Erik's testimony and convicted instead on the basis of Parinello's hearsay testimony is merely "conceivable."[23] Without some additional showing by the applicant of why the remainder of the habeas-record evidence would move the needle (so to speak) from equipoise to a "preponderance of the evidence," I cannot conclude that the fact that the jury *might* have had doubts about the accuracy of Erik's identification is sufficient to "undermine confidence in the outcome" of the applicant's trial.[24] Accordingly, I do not think the applicant has carried his burden to prove prejudice.[25]

22. Dissenting Statement at 279, 281.

23. *See Strickland*, 466 U.S. at 693, 104 S.Ct. 2052 ("It is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding.").

24. *Id.* at 694, 104 S.Ct. 2052.

25. The dissent argues that the "importance of Dangerfield's hearsay statements is evident in that their admission led to the reversal of applicant's first conviction because of their prejudicial impact on the trial." Dissenting Statement at 281. There are two reasons why the fact that the applicant's initial conviction was reversed on the basis of a Confrontation Clause violation is not inconsistent with the applicant's failure to prove prejudice pursuant to a claim of ineffective assistance of counsel in this habeas corpus proceeding. First, there are different standards for obtaining relief on direct appeal, on the one hand, and in a post-conviction habeas application, on the other. On direct appeal from the applicant's initial conviction, the court of appeals applied the constitutional-error harm analysis contained in Rule 44.2(a) of the Texas Rules of Appellate Procedure. *See* Tex. R.App. P. 44.2(a) ("If the appellate record in a criminal case reveals constitutional error that is subject to harmless error review, the court of appeals must reverse a judgment of conviction ... unless the court determines beyond a reasonable doubt that the error did not contribute to the conviction[.]"). The court of appeals could not, pursuant to that provision,

"determine beyond a reasonable doubt that the challenged testimony did not contribute to appellant's conviction." *Walker v. State*, 180 S.W.3d 829, 835–36 (Tex.App.-Houston [14th Dist.] 2005). In other words, the court of appeals concluded that there was a reasonable doubt that the testimony did contribute to the appellant's conviction. On the other hand, in a post-conviction application for a writ of habeas corpus, the applicant bears the burden to show, by a preponderance of the evidence, that he is entitled to relief. *E.g., Ex parte Chandler*, 182 S.W.3d 350, 353 (Tex. Crim.App.2005) (citations omitted). The existence of a reasonable doubt (as on direct appeal) does not suffice to establish a preponderance of the evidence (as in post-conviction habeas corpus review). As a result, the fact that the applicant has failed to meet his burden in the post-conviction context is not at all inconsistent with his obtaining relief originally on direct appeal.

Second, a claim of harm resulting from a violation of one's rights under the Confrontation Clause is different from a claim that one was prejudiced by counsel's deficient representation. In the former, the operative question is whether or not the error "*contribute*[*d*] to the conviction." *See* Tex.R.App. P. 44.2(a) (emphasis added). In the latter, the operative question is whether there is a "'reasonable probability'—one sufficient to undermine confidence in the result—that the outcome would have been different but for his counsel's deficient performance." *Chandler*, 182 S.W.3d at 353 (citations omitted). Even assuming that the evidence presented at each

## CONCLUSION

For an applicant to obtain relief, in a post-conviction application for writ of habeas corpus, on a claim that he received ineffective assistance from his trial counsel, the applicant bears the burden to show, by a preponderance of the evidence, "that his counsel's performance was deficient and that there is a 'reasonable probability'—one sufficient to undermine confidence in the result—that the outcome would have been different but for his counsel's deficient performance." [26] Reviewing the habeas record before me, I do not believe that the applicant in this case has met his burden to show either of these elements. In light of this, I concur with the Court's denial of relief in the instant application for writ of habeas corpus.

ALCALA, J., filed a dissenting statement in which JOHNSON, J., joined.

Rather than employing a Rube Goldberg-type analysis to uphold a conviction at all costs, a habeas court should grant relief when a defense attorney's clearly deficient trial performance prejudicially impacted a defendant's case. This is such a case. It is clear that defense counsel's errors resulted in the jury hearing testimonial and hearsay evidence that linked Samuel Walker, applicant, to the complainant's stolen property, and that this evidence heavily prejudiced applicant because, without it, the State's case consisted solely of a shaky single eyewitness identification by a child. In this application for a writ of habeas corpus, applicant contends that, during his second trial for aggravated robbery, his defense counsel rendered ineffective assistance by permitting the introduction of harmful, inadmissible evidence linking applicant to the complainant's recovered stolen property. *See Strickland v. Washington,* 466 U.S. 668, 693, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). I agree. I would hold that defense counsel rendered ineffective assistance, and I, therefore, respectfully dissent from the Court's denial of this application for a writ of habeas corpus.

## I.  Background

### A.  The Facts

On a summer morning in 2002, Matilde Delgado, the complainant, was in her car in a parking lot with three of her children when she was approached by a black male who pointed a gun at her and threatened to kill her if she did not give him her purse. Delgado, a native Spanish speaker, had to turn away for several seconds to have the robber's words translated to her by her then-thirteen-year-old son Erik, who sat in the front passenger's seat during the incident. The man took her purse and returned to a red car that quickly drove away. A police officer who responded to a call made by bystanders obtained a partial license-plate number from Erik and his brother.[1] Although Erik was absolute-

---

trial was identical to the other, to say that a Confrontation Clause violation *contributed* to the conviction in the first case is not necessarily to say that there is a reasonable probability that, but for this violation, the result *would have been different* in the second case. For this reason as well, a finding of a lack of prejudice in this habeas proceeding is not at all inconsistent with the court of appeals's inability to deem the constitutional violation "harmless" in the applicant's direct appeal from his first trial.

26.  *E.g., Chandler,* 182 S.W.3d at 353 (citations omitted).

1.  The record contains the following exchanges during Erik's testimony with regard to the license-plate and Erik's confidence in the number:

[Prosecutor]: Did you try to get the license plate from the red car?
[Erik]: Yes, sir.
[Prosecutor]: Did you get any information from the plate?

ly positive that the plate number was correct, police officers were unable to find any vehicle in the police database with that number or any variations of the number.[2]

Two days later, during an unrelated arrest for public intoxication, Deidre Dangerfield was found in possession of the complainant's stolen purse, which contained some of its original contents and a handgun. Because she possessed the complainant's property, Dangerfield was interviewed in jail by Detective Parinello, the sheriff's officer investigating the robbery. While questioning Dangerfield about her knowledge of the robbery, Parinello learned that "Low Down" and "Pocahontas" had given her the complainant's property. Parinello entered the aliases into the Gang Task Force police computer database, which revealed that these were the nicknames of applicant and Noralva Ramos, respectively. Parinello acquired their photographs for use in photo spreads that he showed to the complainant and her sons Erik and Edgar. Only Erik identi-

> [Erik]: I got—I think I got the last two numbers and my brother got like the first four numbers or the first letters or numbers.
>
> [Prosecutor]: Did you all memorize it? Did you write it down?
>
> [Erik]: We memorized it. And then when [a bystander] came with the van, we told her and she wrote it down.
>
> Later, on cross-examination:
>
> [Defense counsel]: When you chased after the vehicle, you and your brother, and you got the partial license plate and wrote it down, were you sure that that was the right number?
>
> [Erik]: Yes, sir.
>
> [Defense counsel]: Absolutely positive?
>
> [Erik]: Yes, sir.
>
> [Defense counsel]: Just like you're positive of the identification you've made here?
>
> [Erik]: Yes, sir.
>
> [Defense counsel]: Do you remember that number turned out to be wrong?
>
> [Erik]: Nope. Not that I remember. [Erik]: Nope. Not that I remember.

fied applicant as the perpetrator. When the photo spreads were shown to her, Dangerfield identified applicant as "Low Down" and Ramos as "Pocahontas."

## B. Applicant's First Trial

At applicant's first trial, Parinello testified over applicant's former defense counsel's objection on confrontation grounds that Dangerfield had identified applicant as "Low Down" and Ramos as "Pocahontas," and that Dangerfield had received the complainant's stolen property from "Low Down." Dangerfield did not testify at that trial. Applicant was convicted by the jury and sentenced to forty-five years' imprisonment. On direct appeal, the court of appeals reversed and remanded for a new trial because Dangerfield's unavailability at trial and her testimonial jailhouse statements resulted in constitutional error that violated applicant's confrontation right under the Supreme Court's ruling in *Crawford v. Washington*, 541 U.S. 36, 57–60, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004).

2. The record indicates that the police tried multiple ways to counteract for possible minor error in Erik's memorization of the number:

> [Prosecutor]: Did you get any information in this case, Detective, about a license plate?
>
> [Detective Parinello]: Yes, sir, I did.
>
> [Prosecutor]: What did you do with that information?
>
> [Parinello]: Well, there was a license plate number obtained by one of the complainant's relatives that were with her, but upon checking the plate number that was listed in the report it came back no registration in the MVD [sic] records.
>
> [Prosecutor]: Are you able to tell how many of those letters or numbers were correct or you just know that there's not a plate that exists with that combination?
>
> [Parinello]: Well, with that—the numbers that were given, they were run through the computer with no hit. I tried several variations of the numbers and letters that

*See Walker v. State*, 180 S.W.3d 829, 836 (Tex.App.-Houston [14th Dist.] 2005).

## C. Applicant's Second Trial

At applicant's second trial, Dangerfield again did not appear to testify. The State introduced evidence that, although different in form, was the same in substance as the evidence introduced at the first trial. This evidence came before the jury, initially through back-door hearsay introduced by the State, and later through questioning by defense counsel, who elicited Dangerfield's specific testimonial hearsay statements.[3] First, during the State's questioning of Parinello, the State introduced back-door hearsay about "Low Down's" connection to this offense without any objections from defense counsel asserting that the evidence violated applicant's rights under the Confrontation Clause, and with only two hearsay objections that were ineffectually lodged at inappropriate times. Parinello's testimony indirectly implicated applicant by establishing that his investigation focused on applicant only after speaking to Dangerfield about a person named "Low Down." Second, through his own questions posed to Parinello during cross-examination, defense counsel elicited Dangerfield's specific hearsay statements that she had personally received the stolen property from "Low Down."[4]

During closing argument, the State relied heavily on the hearsay testimony from Parinello to corroborate Erik's identification testimony. The prosecutor effectively argued that the probability that applicant

---

were in there and couldn't get anything off of it either.

**3.** The record contains multiple exchanges during Parinello's direct examination regarding the significance of Dangerfield to the robbery investigation and its focus on "Low Down":

[Prosecutor]: During your investigation, Detective, and prior to speaking to Deidre [Dangerfield], did you receive any information that led you to focus on Low Down?

[Parinello]: Prior to, no, sir.

[Prosecutor]: Was it after speaking to Deidre [Dangerfield] that you received information that led you to focus on a Low Down?

[Parinello]: That's correct.

. . .

[Prosecutor]: Did you then speak with a Deidre [Dangerfield], Detective?

[Parinello]: Yes, I did.

[Prosecutor]: And was it after that during your investigation that you came into information that you focused on the name of Low Down?

[Parinello]: Yes, sir, that's correct.

[Prosecutor]: And when you ran the name of Low Down in the computer, did anything else come up?

[Parinello]: No, sir.

**4.** The record includes the following exchange during Detective Parinello's cross-examination:

[Defense counsel]: [Dangerfield] was arrested and she had in her possession the victim's purse?

[Parinello]: She had the checkbook, credit cards, Social Security cards belonging to her and her children, yes.

[Defense counsel]: She had all the things there were stolen from the victim at the [retail store] parking lot?

[Parinello]: Other than the reported jewelry and cash.

[Defense counsel]: She also had a gun, didn't she?

[Parinello]: Yes, she did.

[Defense counsel]: And when you spoke to her, she told you that Low Down and Pocahontas did it and gave her the things?

[Parinello]: She said she received the property from them, yes.

[Defense counsel]: And she didn't tell you "[applicant's name]," she said "Low Down," right?

[Parinello]: Correct.

[Defense counsel]: And you ran Low Down through the Gang Task Force computer?

[Parinello]: I had HPD check them, yes.

[Defense counsel]: It came back that [applicant] was also known as Low Down?

[Parinello]: Correct.

had committed this offense was four million to one because there was only one "Low Down" in the police database for Houston. The prosecutor's closing argument, in relevant part, stated,

> So, what you have is your credible witness. Find the amount of credibility in [Erik's] certainty. That's all you need, folks. That's all you need under the law. But you have more. What do you have? You have the victim's address, you have the address of the offense, you have the address of the defendant, all in the same part of town. You have the complainant's property found two days later not more than four blocks from that spot, found on [Dangerfield], who we didn't have the benefit of hearing in this case. *But what we do know is from the officer's visit with her, they came into information of* [sic] *a Low Down. And out of a city of 4 million people, they only find one Low Down. And Detective Parinello went forward with the knowledge that Low Down and the defendant, Samuel Walker, are the same person.*

The record shows that the jury was heavily persuaded by the testimony and closing argument linking "Low Down" to the stolen property and applicant. After retiring to deliberate, the jury requested and was permitted to review Parinello's testimony that the computer database matched applicant to "Low Down." The jury retired again before convicting applicant, who was sentenced to forty-five years' imprisonment.

On direct appeal, the court of appeals affirmed applicant's conviction, explaining that counsel waived his claim against "backdoor hearsay" because "he brought out sufficiently similar evidence in his cross-examination of Parinello." *Walker v. State*, No. 14–07–00461–CR, 2008 Tex.App. LEXIS 3360, 2008 WL 1991774, at *6 (Tex.App.-Houston [14th Dist.] May 8, 2008). Because applicant did not assert that his rights under the Confrontation Clause had been violated, the court of appeals did not address that matter on direct appeal. At some point after applicant's trial, counsel was disbarred for events unrelated to this case.

### D. This Post–Conviction Application

In his hand-written writ application, applicant challenges the effectiveness of his counsel on the grounds that counsel failed to timely object to inadmissible hearsay evidence and "failed to protect applicant's federal rights to Confrontation." The State submitted a responsive brief acknowledging its understanding that applicant was complaining of his counsel's ineffectiveness in failing to object to the hearsay evidence offered by the State and in eliciting the improper evidence during counsel's questioning of Parinello. The State noted that "applicant appears to be claiming ... that trial counsel should have objected to the testimony of Detective Parinello ... and further, counsel should not have elicited testimony from Parinello regarding his dealings with Dangerfield." The State contends that counsel's "actions were the product of a strategic decision" and that applicant, therefore, had failed to prove both prongs of *Strickland.*

The trial court did not have an evidentiary hearing on the merits of the application but instead reviewed the record, the State's response, and counsel's two affidavits submitted on applicant's writ. In those affidavits, counsel invoked strategy as his reason for not objecting to the hearsay testimony:

> First, I wanted no ambiguity. I fear blank spaces in evidence. If the detective was simply to testify that his investigation led him to the Defendant, the jury might fill in the gaps on their own.

I am never comfortable with that type of ambiguity. I think juries are inclined to believe that the detective simply followed some routine procedure and found the Defendant. I wanted the detective to identify and discuss the witness that led him to Defendant. Secondly, and closely tied to the first reason, is that the person who identified Defendant gave a ridiculous story and I find it amazing that both the police and the jury believed it. She was arrested in possession of property stolen in the crime. She matched the description of one of the two people who robbed the victims and when questioned about where the property came from, she said, she got it from "Low Dog." There was no further description of this "Low Dog" and the fact that the police failed to realize that she matched the description of one of the robbers and followed her rabbit trail was amazing to me.[5]

Counsel's affidavits, however, also indicate that he knew before trial that the State could not produce Dangerfield to testify:

I knew before trial that the State was unable to produce the witness that would directly prove the link between Defendant and the crime scene at trial.

Explaining that he was "wrong" not to object to the inadmissible evidence, counsel falls on his sword, stating,

I made the choice to let in that evidence because I erroneously believed that it helped exonerate my client and because I wanted to eliminate ambiguity that may have been construed in favor of the State. And I was very, very wrong. After the conviction, I spoke with at least two jurors who told me that this particular testimony was the deciding factor in convicting him.

After making findings of fact, the trial court concluded that defense counsel's performance was not deficient and that he did not render ineffective assistance, and it recommended that this Court deny relief.

## II. Applicant's Defense Counsel Rendered Ineffective Assistance

This Court applies *Strickland's* ineffectiveness standard that requires an applicant to prove by a preponderance of the evidence that (A) counsel's performance "fell below an objective standard of reasonableness under prevailing professional norms," and (B) the applicant was so prejudiced by counsel's errors that a "reasonable probability" exists that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Strickland,* 466 U.S. at 687–88, 694, 104 S.Ct. 2052; *Ex parte Martinez,* 330 S.W.3d 891, 900–01 (Tex.Crim.App.2011). Applying this standard, I conclude that counsel was ineffective.

### A. Counsel's Performance Fell Below an Objective Standard of Reasonableness

In evaluating counsel's performance, I determine that the trial court would have erred by overruling a proper and timely defense objection to Parinello's testimony and that counsel's actions in failing to properly object were objectively unreasonable. *See Ex parte White,* 160 S.W.3d 46, 53 (Tex.Crim.App.2004) (to establish ineffectiveness based on defense counsel's failure to properly object to evidence, defendant must show that trial court would have erred by overruling objection).

### 1. Trial Court Would Have Erred By Overruling Objection

Had defense counsel objected to the back-door hearsay elicited at trial by the

---

**5.** Trial testimony referred to a "Low Down," not a "Low Dog."

State, the trial court would have erred by permitting the evidence. An "out-of-court 'statement' [under Texas Rule of Evidence 801] need not be directly quoted in order to run afoul of the hearsay rules." *Head v. State*, 4 S.W.3d 258, 261 (Tex.Crim.App. 1999) (citing *Schaffer v. State*, 777 S.W.2d 111, 114 (Tex.Crim.App.1989)); *see* Tex.R. Evid. 801(a), (d). Under the Texas Rules of Evidence, the statutory definition of a hearsay "statement" includes "proof of the statement whether the proof is direct or indirect." *Id.; see* 2 Steven Goode, Olin Guy Wellborn III, & M. Michael Sharlot, Texas Practice Series: Guide to the Texas Rules of Evidence § 801.2 (3d ed.2013). Indirect hearsay appears "[w]here there is an inescapable conclusion that a piece of evidence is being offered to prove statements made outside the courtroom," although it further depends on how strongly the content of the out-of-court statement, in context, supports an inference that the State was "attempting to do indirectly what it could not do directly." *Head*, 4 S.W.3d at 261 (quoting *Schaffer*, 777 S.W.2d at 114); *see Poindexter v. State*, 153 S.W.3d 402, 408 n. 21 (Tex.Crim.App. 2005). By asking parallel questions to Parinello whether his investigation focused on "Low Down" prior to and after speaking to Dangerfield, the prosecutor strongly indicated the content of the out-of-court statement by Dangerfield to Parinello. *See Head*, 4 S.W.3d at 261 ("Whether the disputed testimony violates the hearsay prohibition necessarily turns on how strongly the content of the out-of-court statement can be inferred by the context."). Had counsel objected to this indirect hearsay evidence, the trial court would have erred by admitting the testimony.

Furthermore, but for defense counsel's introduction of Dangerfield's out-of-court statements during his cross-examination of Parinello, the trial court would have erred by permitting the introduction of that evidence, which violates the Confrontation Clause of the Sixth Amendment. *Russeau v. State*, 171 S.W.3d 871, 880 (Tex.Crim. App.2005) (citing *Crawford*, 541 U.S. at 59, 124 S.Ct. 1354); *see* U.S. Const. amend. VI. In *Crawford*, the Supreme Court observed that "[s]tatements taken by police officers in the course of interrogations are also testimonial under even a narrow standard" and "fall squarely within [the] class" of testimonial hearsay. *Crawford*, 541 U.S. at 52–53, 124 S.Ct. 1354. The Court later refined *Crawford* by holding that a statement given during police interrogation is testimonial "when the circumstances objectively indicate that there is no ... ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution." *Davis v. Washington*, 547 U.S. 813, 822, 126 S.Ct. 2266, 165 L.Ed.2d 224 (2006).

In this case, Dangerfield was interviewed in jail by a police officer about her knowledge of the robbery because she was found in possession of the complainant's stolen property. The circumstances objectively indicate that, at the time Dangerfield made her statement to the police officer, there was no ongoing emergency, and the primary purpose of the interrogation was to establish or prove past events potentially relevant to later criminal proceedings. *See Davis*, 547 U.S. at 822, 126 S.Ct. 2266. Because the admission of Dangerfield's out-of-court statements violated the Confrontation Clause, the trial court would have erred by permitting them into evidence had counsel not asked his own questions designed to introduce the same evidence.

## 2. Counsel's Actions Were Objectively Unreasonable

Having determined that the trial court would have erred by admitting Dangerfield's statements over a proper defense objection, I next explain why I conclude, (a) applying the appropriate legal standard to this case, that (b) the record shows that counsel's actions objectively demonstrate deficient performance. Furthermore, I also note that (c) the trial court's findings of fact and conclusions of law are ineffectual in this case.

### a. The Appropriate Legal Standard is Objective Reasonableness

I recognize that a court indulges a "strong presumption" that counsel's conduct "falls within the wide range" of reasonable professional assistance and that "under the circumstances, the challenged action might be considered sound trial strategy." *Martinez*, 330 S.W.3d at 900 (quoting *Strickland*, 466 U.S. at 689, 104 S.Ct. 2052). When, however, "no reasonable trial strategy could justify the trial counsel's conduct, counsel's performance falls below an objective standard of reasonableness as a matter of law, regardless of whether the record adequately reflects the trial counsel's subjective reasons for [his actions]." *Andrews v. State*, 159 S.W.3d 98, 102 (Tex.Crim.App.2005); *see also Thompson v. State*, 9 S.W.3d 808, 813 (Tex.Crim.App.1999) (reviewing court looks to "the totality of the representation and the particular circumstances of each case" to evaluate effectiveness of counsel). In reviewing whether an attorney was ineffective, great deference is given to those who have conducted substantial investigations, made informed decisions, and exercised professional judgment. The Supreme Court has explained,

> If counsel conducts such substantial investigations, the strategic choices made as a result "will seldom if ever" be found wanting. Because advocacy is an art and not a science, and because the adversary system requires deference to counsel's informed decisions, strategic choices must be respected in these circumstances if they are based on professional judgment.

*Strickland*, 466 U.S. at 681, 104 S.Ct. 2052. An objective examination of the record shows that, here, rather than showing the exercise of professional judgment, this now-disbarred attorney, through his actions and omissions, permitted inadmissible evidence that provided the sole non-eyewitness link between applicant and the offense, thereby undermining the whole point of the adversary system by substantially bolstering the strength of the State's case.

### b. The Record Objectively Demonstrates Deficient Performance

Although he has invoked a subjective claim of strategy in his habeas affidavit by claiming that he laid out all his cards for the jury so that there would be no "blank spaces in evidence," the record shows that counsel initially ineffectually attempted to exclude this evidence and, only after the evidence was admitted over his untimely and improper objection, did counsel decide to let the jury hear the otherwise inadmissible evidence. The record shows the following exchange during Detective Parinello's direct examination:

[Prosecutor]: Now, during the pendency of your investigation, did you learn any aliases of [applicant]?

[Defense counsel]: Objection, calls for hearsay.

[Trial Court]: Overruled. That's a yes-or-no question.

[Parinello]: Yes, I did.

[Prosecutor]: And what was that alias?

[Parinello]: Low Down.

[Prosecutor]: What is it you did with that, Detective?

[Parinello]: Well, I started researching our computers regarding a Low Down and I could not find anything in our computer system.

. . . .

[Prosecutor]: At any point during your investigation, were you provided information that led you to a Norvala [sic] Ramos?

[Parinello]: That's correct.

[Prosecutor]: And during your investigation, did you learn of any aliases of Norvala [sic] Ramos?

[Parinello]: Well, yes. Do you want me to give you the name?

[Defense counsel]: Objection. Calls for hearsay.

[Prosecutor]: Did you learn of an alias?

[Parinello]: Yes, I did. I'm sorry.

[Prosecutor]: What was that alias?

[Parinello]: Pocahontas.

Had counsel really had a strategy to leave no blanks for the jury, he would not have objected to the State's questions asking about the aliases of applicant and Ramos. Rather, based on counsel's objections to that evidence, the record conclusively demonstrates that counsel's decision to lay all his cards out on the table came only after he was too unskilled in the law to lodge the appropriate objections to exclude the evidence. Once his inadequate objections failed to exclude the inadmissible evidence, counsel then apparently decided to go further himself by asking questions to elicit additional evidence that would otherwise have been inadmissible. As had occurred at the first trial, Detective Parinello was the only witness to make any mention of "Low Down." Counsel's mid-trial decision to lay out all his cards for the jury only after ineffectually attempting to exclude the evidence cannot objectively be characterized as the result of engaging in strategic choices, making an informed decision, or exercising a reasonable professional judgment.

Additionally, in light of the jury's questions asking for specific testimony during their deliberations, the record indicates that the jury gave significant weight to Dangerfield's statements that "Low Down" gave her the complainant's stolen property. My assessment here does not rest on post-conviction statements by jurors who indicated that this hearsay evidence was the deciding factor in convicting applicant. I agree with the concurring opinion's observation that it is improper for courts to consider that type of evidence. *See Ex parte Parra*, No. AP–76,781, 420 S.W.3d 821, 826–28, 2013 WL 5221110, at *4 (Tex. Crim.App.2013) (citing Tex.R. Evid. 606(b)). But that is a different matter from, in analyzing whether certain evidence was material to the jury's verdict, considering that the jury did submit a question to the trial court requesting that testimony be read back to them by the court reporter. *See, e.g., Allen v. State,* 253 S.W.3d 260, 267 (Tex.Crim.App.2008) (deciding whether record showed egregious harm by examining jury's question asking that certain evidence be read back to them). Here, the request that testimony about "Low Down" be read back to the jury shows that the jury was concerned about this matter in its deliberations and that this topic affected its decision, particularly because the evidence about "Low Down" supplied the sole non-eyewitness identification evidence linking applicant to the offense.

Although the concurring statement suggests that my analysis is based on the benefit of hindsight, my analysis is instead based on a review of counsel's performance at the time of the trial. An objective

assessment of counsel's performance in this case reveals that no effective attorney would have engaged in actions permitting this highly prejudicial evidence to be admitted into evidence. Even this attorney initially attempted to keep out this evidence, but he was so unskilled in the law that he was unable to do so. The State ran with this hearsay, essentially arguing in its closing statement that the probability that applicant did not commit this offense was one in four million. Counsel's actions in allowing evidence linking applicant to the property was objectively unreasonable, therefore, because the evidence substantially strengthened the State's case from one based on the testimony of a single shaky eyewitness to one in which a computer gave the odds that the applicant did not commit the offense at one in four million.

### c. The Habeas Court's Fact Findings and Conclusions of Law Are Ineffectual

Although it purported to make findings of fact in this case, the habeas court's first two findings merely describe the existence of applicant's conviction and the last three findings are actually conclusions of law.[6] *See State v. Sheppard*, 271 S.W.3d 281, 292 (Tex.Crim.App.2008) (noting problem of "mixing the apples of explicit factual findings with the oranges of conclusions of

law"). The trial court did, however, factually state that he found defense counsel's affidavit "true and credible," but this finding is immaterial because even though the habeas court believed that counsel subjectively invoked a strategy, that does not answer the question whether that strategy was objectively reasonable. *See Ex parte Ellis*, 233 S.W.3d 324, 330 (Tex.Crim.App. 2007) ("[A]n attorney's cited strategy does not prevent us from determining whether a specific act or omission was 'outside the wide range of professionally competent assistance.'"). Furthermore, although this Court ordinarily defers to findings of fact by the trial court, this Court is the ultimate fact finder in applications for writs of habeas corpus. *See Ex parte Flores*, 387 S.W.3d 626, 634–35 (Tex.Crim.App.2012). I would hold that, contrary to the trial court's determination, applicant has shown counsel's actions fell below an objective standard of professional reasonableness.

Applying an objective standard to this case, defense counsel should have known that, under the applicable law, this evidence was inadmissible both as back-door hearsay and as a violation of applicant's constitutional right to confront witnesses, and he should have precluded the admission of this highly prejudicial, inadmissible evidence by timely and properly objecting and by not himself introducing the evi-

---

6. The trial court issued original and supplemental findings of fact and conclusions of law. In its original findings, the court stated that it reviewed the trial record and "the affidavit of [defense counsel], and finds that the facts therein are true and credible and that said facts combined" were the basis of its findings. Of the trial court's original findings, the first two findings merely recited applicant's conviction date, sentence, court, and judge. In the last three findings, which are actually conclusions of law, the court determined that:

> 3. Applicant's trial counsel did not perform in a deficient manner;

4. The totality of the representation afforded Applicant was sufficient to protect his right to reasonably effective assistance of counsel in trial [sic]; and

5. Applicant has failed to demonstrate that his conviction was improperly obtained.

Accordingly, it is recommended to the Court of Criminal Appeals that requested habeas relief be denied.

Of the trial court's supplemental findings, the first six recited only the facts of applicant's indictment and arrest for the robbery, while the seventh makes a conclusion about an unrelated habeas claim by applicant. The eighth, ninth, and tenth findings repeated the court's earlier findings discussed above.

dence. *See Ex parte Moody,* 991 S.W.2d 856, 858 (Tex.Crim.App.1999); *Ex parte Welch,* 981 S.W.2d 183, 185 (Tex.Crim.App. 1998) (defense counsel's misunderstanding of law governing probation eligibility constituted ineffective assistance of counsel). I would hold that counsel was objectively unreasonable in his subjective strategy to play possum while inadmissible evidence was presented to the jury.

## B. Defense Counsel's Actions Prejudiced Applicant

I conclude that absent the inadmissible evidence that Parinello's investigation focused only on "Low Down" after talking to Dangerfield and that Dangerfield had received the complainant's stolen property from "Low Down," there is a reasonable probability that applicant would not have been convicted. A "reasonable probability" means one "sufficient to undermine confidence in the outcome." *Strickland,* 466 U.S. at 694, 104 S.Ct. 2052. The elimination of Dangerfield's identification of applicant would have left only the single eyewitness identification of a child, Erik. Although Erik was certain about the identification of applicant, he was also certain about the license-plate number, which was proven to be incorrect. The police officer who obtained the license-plate number from Erik and his brother noted that he tried multiple variations of the number and none of them were accurate according to the police computer. This heavily undermines Erik's testimony because he was as certain about the identification of applicant as he was in the mistaken license-plate number. And absent the inadmissible evidence about "Low Down," the jury would have been left solely with Erik's shaky

identification. The importance of Dangerfield's hearsay statements is evident in that their admission led to the reversal of applicant's first conviction because of their prejudicial impact on the trial.

Without Dangerfield's statements, at best, this case comes down to the unreliable testimony of a single eyewitness, which is similar to many of the other cases that have led to the release of wrongly convicted innocent people. According to the Innocence Project, eyewitness misidentification is the single greatest cause of wrongful convictions nationwide, playing a role in nearly seventy-five percent of convictions overturned through DNA testing.[7] Furthermore, that source suggests that more than 300 innocent people have been released from prison nationwide largely due to faulty identifications.[8] I discuss this source, not to suggest that these numbers are precisely correct, but rather to show that today's jurors are aware of the large numbers of people who have been released from prison based on misidentification. Absent the inadmissible evidence linking applicant to the property, there is a reasonable probability that the jury, aware of the problems of misidentification, would have found the shaky identification by a single child-eyewitness an inadequate basis upon which to convict applicant.

## III. Conclusion

I would hold that counsel rendered ineffective assistance by permitting the introduction of evidence that was inadmissible as back-door hearsay and violated applicant's Confrontation rights. I respectfully

---

7.  *Understand the Causes: Eyewitness Misidentification,* THE INNOCENCE PROJECT, (Jan. 31, 2014, 9:46 AM), http://www.innocenceproject. org/understand/Eyewitness–Misidentification. php.

8.  *300 DNA Exonerations—And Counting!,* THE INNOCENCE PROJECT, (Jan 31, 2014, 10:00 AM), http://www.innocenceproject.org/300/.

dissent from the Court's denial of this application for a writ of habeas corpus.