IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON

Assigned on Briefs April 2, 2019

## STATE OF TENNESSEE v. DUSTIN MICHAEL CATHEY

**Appeal from the Circuit Court for Crockett County**
**No. 4258      Clayburn Peeples, Judge**

_____

### No. W2018-00615-CCA-R3-CD

_____

The Defendant, Dustin Michael Cathey, was convicted by a Crockett County Circuit
Court jury of first degree felony murder and second degree murder. The second degree
murder conviction merged into the conviction for felony murder, and the trial court
imposed a life sentence. On appeal, the Defendant argues that the trial court erred in
including language regarding criminal responsibility for the conduct of another in its jury
charge, and he also argues that the evidence is insufficient to sustain his convictions.
After review, we affirm the judgments of the trial court.

**Tenn. R. App. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the court, in which JOHN EVERETT
WILLIAMS, P.J., and TIMOTHY L. EASTER, J., joined.

Michael R. Working and Jennifer Dilley, Memphis, Tennessee, for the appellant, Dustin
Michael Cathey.

Herbert H. Slatery III, Attorney General and Reporter; Caitlin Smith, Senior Assistant
Attorney General; Garry G. Brown, District Attorney General; and Hillary Lawler
Parham and Jason Scott, Assistant District Attorneys General, for the appellee, State of
Tennessee.

## OPINION

## FACTS

The Defendant was indicted for first degree premeditated murder and first degree
felony murder in the death of the eighty-nine-year-old victim, Frances Lilley. The State

requested that the Defendant's trial be joined with the trial of Daniel Parker. The trial court found that the Defendant and Mr. Parker could have been jointly indicted, but the court denied the motion after finding that the Defendant had shown clear prejudice from a joint trial. The Defendant's case proceeded to trial.

### State's Proof

Through the testimony of John Cole, telecom operations manager for TEC, the State introduced records from the victim's telephone, which included calls that were dialed, received, and misdialed during the time surrounding the murder. Robert Howell, keeper of records for Crockett County 911, authenticated the 911 call made by Alymer Lilley, the victim's husband, reporting the murder, and it was played for the jury. Mr. Howell believed that the call came in about two minutes before midnight on August 4, 2011.

Bobby Vaughn, the victim's brother, testified that Mr. Lilley was alive at the time of the victim's murder but had since passed away. Mr. Lilley suffered from dementia and the victim took care of him. His dementia often caused him to have some confusion. They lived on farmland in the country.

Jim Knox, Chief of Police for the city of Alamo, testified that he responded to the 911 call to the victim's house, possibly sometime after 11:00 p.m. He recalled that there were a number of fields around the victim's home, and the area was "pretty dark" at night. Upon entering the home, the police found Mr. Lilley sitting in a chair, and the deceased victim was lying on the floor. The victim's body was cool to the touch. Chief Knox left the scene five or ten minutes later when the ambulance personnel and coroner arrived. Chief Knox said that Deputy Parks also responded to the scene, but he had suffered a stroke since the murder and was therefore unable to testify at trial.

Dr. Marco Ross, the Deputy Chief Medical Examiner for the West Tennessee Regional Forensic Center, performed the autopsy on the victim. The victim suffered from two gunshot wounds, one in her neck and one in her right shoulder. The gunshot to the victim's neck was the fatal wound. She also sustained rib fractures, which Dr. Ross surmised may have been caused by the gunshot or by falling after being shot. A bullet was recovered from the victim's upper back. Dr. Ross said that it appeared the victim had been shot from a distance, but he could not tell from how far. He could only surmise from the lack of gunpowder on her body that she was shot from a distance greater than 3 or 4 feet.

Tennessee Bureau of Investigation ("TBI") Agent Phillip Cicero led a team of investigators in the victim's murder investigation. Agent Cicero and his team arrived at

the crime scene around 9:00 a.m. the morning after the murder. There was a large cotton field to the right of the house, and it was surrounded by a lot of farmland. The victim's body was found between the kitchen and family room inside the home. It appeared that a shot had been fired through a sliding glass door into the house, killing the victim.

Agent Cicero recalled that there was a deep freezer in the carport, which the TBI dusted for fingerprints and swabbed for DNA. A jar of frozen jam was found sitting on top of the air conditioning unit behind the house. The circumstances indicated that the jam had been taken from the deep freezer. A cigarette butt was collected from the road in front of the house.

Sheriff Troy Klyce with the Crockett County Sheriff's Department responded to the crime scene shortly after midnight on August 5, 2011. The victim had been shot multiple times, and her husband was present but disoriented with dementia-like symptoms. Sheriff Klyce called the TBI to investigate the scene.

Through the course of his investigation, Sheriff Klyce learned that Mr. Lilley had attempted to call Darrell Manning, who lived nearby and helped the Lilleys with their land. Sheriff Klyce made a recording of a message that Mr. Lilley left on Mr. Manning's answering machine. Mr. Lilley was the one who initiated contact with law enforcement, but it was not clear how long it took him to dial 911 successfully. Sheriff Klyce surmised that the victim was murdered after dark because a flashlight was found on the floor near her body.

Sheriff Klyce testified that two weeks after the murder, police executed a search warrant of the Defendant's home in which they found a box of .22-caliber cartridges. That same day, police visited Roger Mosier's residence in Alamo looking for Daniel Parker, who had failed to appear in court on another matter. Mr. Parker was also a suspect in the victim's murder. Mr. Mosier and Trina Parker, Mr. Parker's mother, were there. Ms. Parker, who was "frantic and really nervous," told Sheriff Klyce that she had "the gun." Ms. Parker took the police to her home and gave them the gun. Officers located Mr. Parker later that night at the home of Dustin Ellis. The next day, Mr. Parker accompanied officers to his home and turned over the manufacturer's box that originally came with the gun that was recovered from Ms. Parker. Mr. Parker advised officers that he took the shells out of the gun, but the police never located the shells.

Sheriff Klyce said that several people were suspects during the course of the investigation, including Brittany Bushart; Dustin Ellis, because he was in possession of the murder weapon at some point in time; the Defendant; and Daniel Parker, who was eventually charged with the crime like the Defendant. Sheriff Klyce stated that, to his

- 3 -

knowledge, the Defendant, Mr. Parker, and Mr. Ellis were all friends during the time period at issue in 2011.

Detective Penny Curtis worked for the Crockett County Sheriff's Department at the time of the incident. Detective Curtis responded to the scene during the early morning hours of August 5, 2011. She observed two jars of strawberry jam sitting on an air conditioning unit behind the house. The jars were frosted over, leading investigators to believe they had been sitting out for a while.

Detective Curtis testified that in addition to the box of .22-caliber cartridges found in the Defendant's bedroom when they executed a search warrant, officers found a plastic cup with a red sticky substance and more of the same sticky substance on the floor. Detective Curtis searched the Defendant's vehicle and found a camouflage bag containing a hammer and assorted tools, gloves, and a full-face camouflage mask. Detective Curtis recalled encountering Daniel Parker's mother later that day, similarly to Sheriff Klyce. She remembered that Ms. Parker said to them, "My son did not kill the old lady."

Detective Curtis testified that, with regard to the gun officers recovered from Ms. Parker, Mr. Parker told them that he had bought it from Dustin Ellis and then sold it to his mother. She recalled that Mr. Parker informed the officers that there were two spent shells stuck inside the gun when he bought it that he had to pry out using a knife. The police never located the shells. Detective Curtis stated that she spoke with Debra Wright, who lived in the vicinity of the victim but not necessarily within walking distance. Ms. Wright advised that Mr. Parker came to her house on August 4th and again on the morning of the 5th. Detective Curtis also spoke with Homer Joe Young, who likewise lived in the vicinity of the victim, and Mr. Young advised that he saw Mr. Parker walking around the Chestnut Bluff-Broadview intersection at 5:30 p.m. on the day of the shooting.

TBI Agent Cathy Ferguson assisted Crockett County law enforcement with the investigation of the case. Upon her arrival on the scene, Agent Ferguson learned that a family member had spoken to the victim on the telephone sometime between 8:00-8:30 p.m. Agent Ferguson subpoenaed phone records for the victim's home telephone in order to establish a time frame because the victim's husband knew that he had called 911 but did not know what time due to his dementia. Approximately 27 calls were made between 10:26 p.m., when the victim's husband attempted to call a neighbor, Darrell Manning, and 11:58 p.m., when he successfully contacted 911.

Agent Ferguson testified that she walked through the house to document evidence, take photographs, and determine the scope of the crime scene. Two jars of freezer jam were sitting on the air conditioning unit behind the house. The jars were "frosty" and

appeared to have been recently removed from a freezer. Agent Ferguson packaged the jars in a way to preserve fingerprint evidence, and they were placed into a temperature controlled TBI crime scene truck. However, the jars spilled en route to Nashville, destroying any potential fingerprints or DNA that might have been on the jars. Among other evidence at the scene, Agent Ferguson noted that a broken flashlight was found on the floor near the victim's body, and the victim's purse containing $800 in cash was on a chair pushed under the dining room table.

Agent Ferguson testified that she, as well as Sheriff Klyce and Detective Curtis, went to Roger Mosier's house to look for Mr. Parker and while there, Mr. Parker's mother told them that she "ha[d] the gun." Ms. Parker took the police to her home and gave them the combination to the safe in which they found a gun. Agent Ferguson said that it was her responsibility to follow up on collected evidence and determine evidentiary value to the investigation. She determined that none of the evidence she collected, such as a shoe print and a cigarette butt, had evidentiary value. She learned that the field next to the victim's home had recently been sprayed and believed that the shoe print was from a field worker rather than a suspect.

Agent Ferguson testified that she took a statement from the Defendant on September 12, 2011. With regard to the gun that was recovered from Ms. Parker's house, the Defendant said that he stole it from Billie Pitts, his grandmother, in the middle of July and sold it to Dustin Ellis one week later for $45. The Defendant elaborated that he was driving through Maury City when he saw Mr. Ellis at a gas station and asked him if he wanted to buy the gun. They met up again between 11:00 p.m. and midnight and completed the transaction. The Defendant said that the gun was not loaded when he sold it to Mr. Ellis. The Defendant claimed that he heard of the victim's murder one or two days after he sold the gun. The Defendant told Agent Ferguson that he knew Daniel Parker because they did drugs together and said that he visited Mr. Parker's home after he sold the gun to Mr. Ellis. Agent Ferguson said that the Defendant's cell phone records showed a decrease in activity during the time frame that investigators believed the victim to have been murdered. There was no activity between the Defendant and Mr. Parker's cell phones during the period in which the victim was likely murdered.

Agent Kevin Warner worked as a firearms examiner with the TBI at the time of the murder, and he examined the gun that was recovered from Ms. Parker's residence. Agent Warner described the gun as being of low quality and mass produced and said that such a gun is easily damaged. He compared the bullet that was recovered from the victim's body and determined that it had the same class characteristics as bullets that had been fired from the recovered gun. While he could not say so definitively, he opined that the bullet likely had been fired from that gun. He also test-fired several of the bullets that were found in the Defendant's bedroom and, after comparing those test-fired bullets to

the bullet recovered from the victim's body, determined that they were fired from the same gun.

Dr. Eric Warren worked with the TBI as a ballistics expert at the time of the murder, and he was part of the team that examined the crime scene. He noted that a windowpane of the sliding glass door had been shattered by a bullet. He also noted that a house plant sitting on the kitchen table just inside the sliding glass door had several holes in its leaves. Dr. Warren further found holes in the curtains and a window behind the victim's body. He found the presence of lead on the house plant, table, curtains and window. Based on the bullet holes, Dr. Warren was able to determine the trajectory of the bullets. Dr. Warren also re-examined the bullet that was recovered from the victim's body, the gun that was recovered, and the bullets that were recovered from the Defendant's home. He could not form a conclusive opinion regarding whether the bullet recovered from the victim's body was fired from the recovered gun due to damage to the bullet. However, he determined that the bullet shared the same class and individual characteristics as bullets fired from the gun, and he did not find any evidence to suggest that the bullet was not fired from the gun. Dr. Warren further concluded that the bullet recovered from the victim's body was the same type and design as the bullets that were found in the Defendant's room.

Ashley Clem testified that she and the Defendant had a child together. At the time of the murder, Ashley[1] was living in Bells with her mother, Jacqueline Clem. The Defendant stayed with them "a lot of the time" or with his father in Maury City. Ashley provided a statement to the police in which she recounted that the Defendant came to her house with a gun in a box on the evening of the murder between 8:30-9:00 p.m. He showed the gun to Jacqueline, but she did not see the gun herself. Ashley saw the Defendant again the next morning, and he told her that he had sold the gun. The Defendant also told her that he had been out all night with Mr. Parker and Mr. Ellis. The Defendant had money, but Ashley did not know where he obtained it. Ashley recalled that she texted the Defendant when she heard about the victim's death, and he told her that he had been in Maury City with Mr. Parker and Mr. Ellis.

On cross-examination, Ashley testified that the Defendant received a text message from his mother in Ashley's presence informing him of the victim's death. The Defendant explained to Ashley that he knew who the victim was because he and his father had looked at her truck several years earlier to potentially buy it. Ashley recalled that during the time period of the incident, the Defendant's father had kicked him out of the house because the Defendant was using drugs.

---

[1] Because some of the witnesses have the same last name, we will refer to them by first name only at times for clarity. We mean no disrespect by this practice.

Jacqueline Clem recalled that she gave a statement to police about three weeks after the murder in which she said that she saw the Defendant with a .22-caliber gun in a box around 8:30-9:00 p.m. the night of the murder. When the Defendant left, he said that he was going to try to sell the gun. The Defendant returned in the early morning hours the next day. On cross-examination, Jacqueline said that she did not know the exact date the above interaction with the Defendant occurred, only that it was around the time period of the victim's murder.

Dustin Ellis testified that he knew both the Defendant and Mr. Parker. Mr. Ellis recalled a night in early August 2011 when he went out with his friend Chris Hughes. They attended a cookout at Timmy Mosier's home until 10:00 or 11:00 p.m. and then went to a bar but did not stay because there was no air conditioning. They drove around for a while and then stopped at their friend Antwan Claybrooks' home around midnight-12:30 a.m. They were in the driveway talking to Mr. Claybrooks when the Defendant pulled up in a white Ford Explorer, showed them a gun and said he was trying to sell it. Mr. Ellis bought the gun from the Defendant for $40 and put it behind the seat of his truck. Mr. Ellis recalled that when the Defendant pulled up, he was acting "kind of out of the ordinary, kind of crazy-eyed," and Mr. Ellis thought the Defendant was going to rob them.

Mr. Ellis testified that the Defendant rode with him and Chris Hughes to a store in Maury City to buy beer. He decided to drop the gun off at his mother's house in Alamo because he was driving around drinking alcohol, and he left the gun in a toolbox in his mother's carport. They continued to Brownsville to buy beer and rode around drinking it before returning to Crockett County. Mr. Ellis eventually dropped off Mr. Hughes and then took the Defendant to his vehicle around 2:00 a.m.

Mr. Ellis testified that as he was dropping off the Defendant, he saw Mr. Parker turning onto the road where he lived. He went to Mr. Parker's house and visited with him for about an hour. He recalled that Mr. Parker's demeanor was not unusual for 2:00 a.m. About ten minutes after he arrived at Mr. Parker's house, the Defendant also showed up, and the three men drank and watched television. Mr. Ellis eventually went home to go to sleep. He did not think that the Defendant was still at Mr. Parker's home when he left.

Mr. Ellis testified that he stopped by a gas station on his way to work later that morning. He saw Mr. Parker there and mentioned that he had bought a gun from the Defendant that he did not need. Mr. Parker offered to buy it for $40 to give to his mother who lived alone. They met at Mr. Parker's house a short while later to finalize the transaction.

- 7 -

Mr. Ellis acknowledged that he gave more than one statement to the police. In his first statement, given two weeks after the incident, Mr. Ellis said that around 1:00 or 2:00 a.m. on August 5, 2011, he saw the Defendant driving down the road in the opposite direction. They both pulled off the road to speak, and then the Defendant got into the truck with him and rode around to drink beer. The Defendant had money to buy beer because Mr. Ellis paid him $40 for the gun. Mr. Ellis did not mention anything in his statement about seeing the Defendant at Mr. Claybrooks' home.

Mr. Ellis agreed that he gave another statement to police approximately three weeks later, which included information about seeing the Defendant at Mr. Claybrooks' house. He explained that he omitted details about Mr. Claybrooks in the first statement because Mr. Claybrooks was known to sell marijuana, and Mr. Ellis did not want to mention him. Mr. Ellis confirmed that he testified consistently in the Defendant's and Mr. Parker's trials and had not tried to skew his testimony to help either individual.

George Foster was an inmate housed in the same jail pod as the Defendant at various times, and they were friendly with one another. In the spring of 2012, Mr. Foster and the Defendant were smoking a cigarette in the sally port together when the Defendant told him that he and Mr. Parker had accidentally shot an old lady in Crockett County. The Defendant elaborated that he and Mr. Parker were "strung out" on drugs and had gone to the victim's residence to steal metal when they panicked. The Defendant and Mr. Foster were in the same "white pride" prison gang, and the Defendant "put it on the cross" about what he had done. Mr. Foster contacted Detective Curtis to tell her what he had learned from the Defendant. Mr. Foster denied that he received a benefit from testifying against the Defendant, elaborating that he gave a statement because "there's a difference in right and wrong . . . [and] you're supposed to do what's right." Mr. Foster admitted that he had three prior convictions for sexual battery and one for violating the sex offender registry.

Glenn Johnson was incarcerated in the Crockett County Jail in September 2011 for driving under the influence, and he was housed in a cell with the Defendant and two other men. He did not know the Defendant prior to his incarceration but he was friends with Mr. Parker beforehand. He did not know that the Defendant and Mr. Parker knew each other. Mr. Johnson recalled that he overheard the Defendant telling someone that he was involved in the victim's homicide, and the Defendant later told him about it directly. The Defendant was upset and crying in the cell one night, and he confided in Mr. Johnson that he had shot the victim. The Defendant said that he was stealing scrap iron when it happened. Mr. Johnson informed Sheriff Klyce of the Defendant's confession after Mr. Parker encouraged him to come forward with the information. Mr. Johnson thought that the Defendant was taking Seroquel when he confessed.

John Anderson was imprisoned with the Tennessee Department of Correction on an aggravated burglary conviction at the time of trial but in 2011 was incarcerated in the Crockett County Jail. He and the Defendant were assigned to the same pod, which held approximately 16 inmates. One night while most of the inmates were sleeping, Mr. Anderson stayed awake reading a book. The Defendant was pacing, told Mr. Anderson that he needed to get something off his mind, and began talking about the victim's homicide. The Defendant told him that he had done yard work for the victim the day before the murder, and she had paid him $100 and gave him something to eat and drink. The Defendant said that he bought drugs and diapers with the money, but his girlfriend was "on him" because their baby needed food and more diapers. He remembered that the victim had tools and other valuable items in her shed, so he decided to steal the items and sell them. He parked his truck behind some bushes near the victim's home and planned to wait until sundown, but he became hungry. He went to the victim's home, took some strawberry jam and peanut butter, and made some sandwiches. He then returned to the bushes to eat, smoke a cigarette, and wait for dark.

Mr. Anderson continued recalling that the Defendant told him that he went to the shed once the sun set. As he was about to go in, he was surprised when a light came on in the house, and he turned and fired toward the light. The victim fell down, and the Defendant fled. The Defendant appeared to be nervous and sad as he recounted what had occurred. Mr. Anderson told Detective Curtis the following day about the Defendant's confession. In the statement given to Detective Curtis, Mr. Anderson said that the Defendant told him that he was smoking methamphetamine while he waited in the bushes, and he became agitated because the victim did not go to bed as early as he had hoped. He wanted more methamphetamine, so he acted sooner than he had planned. The Defendant told Mr. Anderson that he sold the gun to get money for methamphetamine and supplies for his baby. The Defendant also told him that he had stolen the gun from his grandfather. Mr. Anderson confirmed that he did not receive any benefit from telling the police about the Defendant's confession.

On cross-examination, Mr. Anderson acknowledged that he told the Defendant that he knew how to beat a murder charge. Mr. Anderson admitted that the majority of his own crimes involved breaking into people's backyard sheds and stealing tools.

**Defendant's Proof**

Brandon Park testified that John Anderson had stolen lawn equipment from him, and he did not think Mr. Anderson had a reputation for being an honest and trustworthy person because he was a thief.

Shane Perry testified that he was familiar with Mr. Anderson and said that he had a reputation for untruthfulness. Mr. Perry's opinion was based on Mr. Anderson's having sold him stolen goods.

Homer Joe Young testified that between 5:00-6:00 p.m. on the night of the murder, he was driving on Chestnut Bluff-Maury City Road when he saw Mr. Parker by the side of the road. He thought that Mr. Parker might have been hurt in a car accident because he was holding his arm, so Mr. Young turned his car around to look for him but did not find him. The following morning, Mr. Young saw crime scene tape at the victim's house and told the officers about having seen Mr. Parker the evening before. Mr. Young identified Mr. Parker from a photographic lineup several months after seeing him walking down the road.

Brittany Bushart testified that she lives just off Chestnut Bluff-Maury City Road with her parents. She and Mr. Parker have a child together but are no longer dating. In 2011, Ms. Bushart's parents forbid Mr. Parker from coming to their house. Her parents were out of town the first week of August that year, and Ms. Bushart invited friends over to swim. Mr. Parker showed up uninvited, and her aunt and uncle made him leave. She and Mr. Parker had a tumultuous relationship.

Ms. Bushart testified that a few days later, she found Mr. Parker swimming in her pool. He was supposed to have gone to court that day. She threatened him with a gun to force him to leave. Shortly thereafter, she went to Mr. Parker's house, and they argued. She slipped and irritated a prior knee injury. Meanwhile, Mr. Parker called the police to report that she had a loaded gun and was going to hurt him. She went home and did not speak to him again until around midnight when he showed up at her house. They argued, and then she drove him to his vehicle that was parked on Green Road around 12:30-1:00 a.m. He had left his car in front of Debra Wright's house, which was a couple of miles from Ms. Bushart's house. Ms. Bushart did not know why Mr. Parker had parked in front of Ms. Wright's house or how he got from his car to her house. However, she did not think it was strange that his car was parked so far away because he was not allowed to come to her house.

Ms. Bushart elaborated that she wanted Mr. Parker to leave her house that day because she did not want her parents to learn that he had been there. Her parents had custody of her child at the time because she had a drug abuse problem that was a direct result of her involvement with Mr. Parker. Ms. Bushart recalled that she provided a statement to police approximately one year after the murder. She told the officers that her memory was fuzzy because she had been taking drugs at the time. She also told them that she had smoked marijuana and used pain pills the day before she gave the statement. Ms. Bushart further admitted that she had used drugs just a few weeks before trial. At the

time of trial, she had a platonic relationship with Mr. Parker and was in a romantic relationship with someone else. Ms. Bushart estimated that the victim's house was three or four miles from her house.

Betty Bushart, Brittany Bushart's grandmother, testified that Brittany[2] called her the evening of August 4, 2011, saying that she had fallen by the pool and hurt her leg. Betty went to Brittany's house to check on her and stayed until 10:00-10:30 p.m. She did not see Mr. Parker or his car while she was at Brittany's house.

Debra Wright[3] recalled that Mr. Parker had asked to leave his truck in her driveway around 9:00-10:00 p.m. sometime in early August 2011 due to a problem with the fuel pump. Ms. Wright recalled that a white SUV was with Mr. Parker when he dropped off his vehicle, but she was not sure who was driving it. Ms. Wright did not see the Defendant that evening. Brittany Bushart brought Mr. Parker back to get his truck the next morning around 9:30-10:00 a.m., and she was driving a white SUV. Mr. Parker asked Ms. Wright if she could sell him some gas, but she did not have any, so she took him to a gas station nearby. While en route, Mr. Parker asked to use Ms. Wright's phone to call his grandmother because he had missed court the day before. He also told Ms. Wright that he had called the police on Ms. Bushart the previous day because she had threatened him with a gun. Ms. Wright recalled that Mr. Parker was wearing shorts and had dried mud from his neck to his feet. He had burrs stuck to him, and he appeared to be under the influence of something. He looked like he had been up all night. Mr. Parker told her that he had walked to her house in the middle of the night to get cigarettes.

Private Investigator Jay North testified that he re-created "potential routes" that Mr. Parker could have run according to witness testimony in an effort to show that Mr. Parker was the murderer. Mr. North noted that he was about the same age that Mr. Parker would have been at the time of the murder and that he was a relatively fit and active person. He found that it was "fairly tough" to run some of the routes due to conditions of the field and land obstacles like ditches. He ran the routes in the month of February.

The first route Mr. North ran was a 1.7 mile route from the victim's house to the intersection of Climer Road and Chestnut Bluff-Maury City Road, which took him about 22.5 minutes. The next route was a 2.05 mile route from the victim's house to the intersection of Antioch Road and Chestnut Bluff-Maury City Road, which took him right

---

[2] Because some of the witnesses have the same last name, we will refer to them by first name only at times for clarity. We mean no disrespect by this practice.

[3] Ms. Wright had divorced at the time of trial and was going by the last name of Deaton, but for consistency with other witness testimony, we will refer to her by the last name of Wright.

under 28 minutes. He also ran from the victim's house to Broadview Road where the Defendant lived, which was a distance of two miles and took him almost 28 minutes. Mr. North said that he was "pretty scraped up" and covered in brush after running through the fields.

Mr. North also drove between several points of reference, noting the time and distance. The distance between the victim's home and the intersection of Climer Road and Chestnut Bluff-Maury City Road, which was a logical location for someone running through the fields to exit onto the road, was 2 miles and took 3 minutes and 45 seconds to drive. The distance between Climer Road and Antioch Road was .2 miles and took 31 seconds to drive. The distance from the intersection of Antioch Road and Chestnut Bluff-Maury City Road to Debra Wright's residence on Green Road was two miles. The distance from the victim's residence to Ms. Wright's residence was 4.2 miles and took Mr. North 7 minutes and 40 seconds to drive.

Lauren Hanks also worked as a private investigator for the defense. Ms. Hanks identified photographs taken by the defense team of the victim's residence and a high voltage utility line that ran from close to the victim's residence by several points of interest and witnesses' homes, ending near the Bushart residence. Ms. Hanks talked to Debra Wright and Homer Joe Young and used information learned from them to create potential routes through the fields that Mr. Parker could have hypothetically taken. Ms. Hanks accompanied Mr. North when he ran and drove potential routes.

Chief Shannon Hughes, jail administrator for the Crockett County Jail, testified that the Defendant's records did not indicate that he was ever administered Seroquel while in the jail. Chief Hughes also testified that inmate records revealed that the Defendant and Glenn Johnson were housed together from September 10-13 and then again from September 15-20, 2011. The Defendant and John Anderson were housed together from September 20-October 10, 2011. The Defendant was charged with first degree murder on September 30, 2011. Chief Hughes recalled that he observed the Defendant and Mr. Foster standing together in the sally port area laughing and joking on April 11, 2012, despite their being housed in different pods at the time.

Myranda Austin testified that she did not know the Defendant and only saw him for the first time the day of trial. However, she met Mr. Parker in July 2011, and they used drugs together. Ms. Austin recalled that Timothy Climer, the father of her two oldest children, was "good party buddies" with Mr. Parker. In the fall of 2011, Ms. Austin attended a drug party where she overheard Mr. Parker tell Mr. Climer that he had shot the victim and started crying. He said that his truck had broken down while he was with a friend. They were trying to siphon gas when he heard a noise, and "he turned around and . . . shot her." Ms. Austin admitted that she had smoked marijuana, taken

pills, and smoked methamphetamine that night but said that Mr. Parker's confession was a sobering moment. Ms. Austin recalled that Mr. Parker was acting paranoid that night.

Ms. Austin acknowledged that she did not report what she heard right away because she did not want to be involved. She said that about two years later, Mr. Climer attempted to use the information about Mr. Parker "to get out of some trouble." Ms. Austin was then contacted by law enforcement to give a statement about what she had overheard at the party, which she did on September 12, 2013.

Following the conclusion of the proof, the jury convicted the Defendant of second degree murder in Count 1 and first degree felony murder in Count 2. The trial court merged the convictions and sentenced the Defendant to life imprisonment for first degree felony murder.

## ANALYSIS

### I. Jury Instructions

The Defendant argues that the trial court erred in including language relating to criminal responsibility in its jury instruction on felony murder.

"It is well settled that a defendant has a constitutional right to a complete and correct charge of the law, so that each issue of fact raised by the evidence will be submitted to the jury on proper instructions." State v. Dorantes, 331 S.W.3d 370, 390 (Tenn. 2011); see also State v. Farner, 66 S.W.3d 188, 204 (Tenn. 2001) (citing State v. Garrison, 40 S.W.3d 426, 432 (Tenn. 2000)). Accordingly, trial courts have the duty to give "a complete charge of the law applicable to the facts of the case." State v. Davenport, 973 S.W.2d 283, 287 (Tenn. Crim. App. 1998) (citing State v. Harbison, 704 S.W.2d 314, 319 (Tenn. 1986)). "Whether jury instructions are sufficient is a question of law appellate courts review de novo with no presumption of correctness." State v. Clark, 425 S.W.3d 268, 295 (Tenn. 2014).

In this case, the trial court issued the pattern jury instruction for felony murder, instructing the jury, in pertinent part: "For you to find the [D]efendant guilty of this offense, the [S]tate must have proven beyond a reasonable doubt the existence of the following essential elements: (1) that the [D]efendant, or one for whom the [D]efendant is criminally responsible, unlawfully killed the alleged victim[.]" This instruction conforms to the Tennessee Pattern Jury Instruction for first degree felony murder. 7 Tenn. Prac. Pattern Jury Instr. T.P.I.-Crim. § 7.03 (12th ed. 2018).

- 13 -

Initially, the State attempted to try the Defendant and Mr. Parker together, but the trial court denied the State's motion for joinder. The trial court noted that the State had "proven that each defendant is charged with the accountability for each offense included in the [i]ndictment and could have been indicted under the same indictment," but nonetheless found that the Defendant had established prejudice from a joint trial and denied joinder.

At trial, the State presented evidence that both the Defendant and Mr. Parker were charged with the victim's murder. The State also presented evidence that the Defendant and Mr. Parker were together the night in question, and there was no activity between the Defendant's and Mr. Parker's cell phones during the time frame of the murder. The Defendant's claim that the "trial court provided a means by which the jury could find [him] guilty on a theory that ne[ither] party believed to be true" is without merit. It is apparent that the State believed that the Defendant and Mr. Parker were jointly responsible for the victim's murder but was prohibited from trying them together. The State presented evidence indicating that both men were suspected in the victim's death, as well as witness testimony that the Defendant said he was with Mr. Parker on the night of the murder.

Regardless, the State presented evidence that the Defendant admitted to at least three people that he had accidentally shot the victim while attempting to steal tools and scrap metal from her property. The State also presented evidence that the Defendant was in possession of the murder weapon on the night in question. The Defendant admitted to police that he had stolen the gun from his grandmother. The inclusion of the language "or one for whom the [D]efendant is criminally responsible" was mere surplusage. The evidence established that the Defendant shot the victim, and the State did not argue that the Defendant was criminally responsible for anyone else's actions.

Furthermore, the trial court did not issue a jury instruction on criminal responsibility but instead specifically advised the jury:

> The only question you must answer as to each of these counts is whether the State proved beyond a reasonable doubt that he committed that offense. It's not up to you to decide whether any other person is guilty of any other crime or of those crimes. The question of the possible guilt of others should not enter your thinking when you decide whether the State has proven beyond a reasonable doubt that this defendant committed the crimes with which he is charged.

The jury was explicitly advised that it was to base its findings on the Defendant's actions alone. The jury instructions, read as a whole, fairly submitted the legal issues and

did not mislead the jury as to the applicable law. See State v. Faulkner, 154 S.W.3d 48, 58 (Tenn. 2005). The Defendant is not entitled to relief on this issue.

## II. Sufficiency

The Defendant argues that the evidence is insufficient to sustain his convictions. He contends that Mr. Parker was the one who killed the victim and that the witnesses who testified that the Defendant confessed to the murder were not credible.

When the sufficiency of the convicting evidence is challenged on appeal, the relevant question of the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979); see also Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."); State v. Evans, 838 S.W.2d 185, 190-92 (Tenn. 1992); State v. Anderson, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992).

A criminal offense may be established entirely by circumstantial evidence. State v. Majors, 318 S.W.3d 850, 857 (Tenn. 2010). It is for the jury to determine the weight to be given the circumstantial evidence and the extent to which the circumstances are consistent with the guilt of the defendant and inconsistent with his innocence. State v. James, 315 S.W.3d 440, 456 (Tenn. 2010).

All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. See State v. Pappas, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). It is not the role of this court to reweigh or reevaluate the evidence, nor to substitute our own inferences for those drawn from the evidence by the trier of fact. State v. Reid, 91 S.W.3d 247, 277 (Tenn. 2002). "A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal a convicted defendant has the burden of demonstrating that the evidence is insufficient." State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

First degree felony murder is the "killing of another committed in the perpetration of or attempt to perpetrate any . . . robbery, burglary, [or] theft[.]" Tenn. Code Ann. § 39-13-202(a)(2). Second degree murder is defined as "[a] knowing killing of another[.]" Id. § 39-13-210(a)(1).

The Defendant's challenge to the sufficiency of the convicting evidence rests on his trying to show that it was instead Mr. Parker who killed the victim, as well as giving reasons why the witnesses who testified that the Defendant confessed to them were unreliable. However, there is ample evidence from which the jury could determine that the Defendant was guilty, and credibility determinations and resolution of any conflicts in the evidence are matters for the jury.

The murder was believed to have occurred after 8:00 p.m. when a family member spoke to the victim but before midnight when the 911 call was made reporting the shooting. Ashley Clem, the mother of the Defendant's child, and Jacqueline Clem, Ashley's mother, both testified that the Defendant brought the gun to their house the evening of the murder between 8:30-9:00 p.m. When the Defendant returned the following morning, he said that he had sold the gun. He also said that he had been out all night with Mr. Parker and Mr. Ellis. Mr. Ellis testified that he bought the gun from the Defendant sometime after midnight and that the Defendant was acting "kind of out of the ordinary, kind of crazy-eyed." The Defendant told Mr. Foster that he and Mr. Parker were "strung out" on drugs and had gone to the victim's residence to steal metal when they panicked and accidentally shot the victim. The Defendant's cell phone records showed a decrease in activity during the timeframe that investigators believed the victim to have been murdered, and there was no activity between the Defendant's and Mr. Parker's cell phones during the period in which the victim was likely murdered. The Defendant also confessed to fellow inmates Glenn Johnson and John Anderson at other times.

The Defendant argues that the evidence establishes that Mr. Parker committed the murder, pointing to testimony that Mr. Parker was "disheveled near the crime scene before and just after the murder." However, the Defendant's claim that the evidence establishes Mr. Parker's guilt and the Defendant's innocence is without merit.[4] Rather, the evidence strongly establishes that the Defendant was in possession of the murder weapon during the time of the murder. Any evidence potentially placing Mr. Parker with the Defendant during the timeframe in question does not exonerate him of guilt.

Moreover, the Defendant's attempt to discredit the three inmate witnesses does not entitle him to relief. The credibility of witnesses, the weight of their testimony, and the reconciliation of conflicts in the evidence are matters entrusted to the jury as the trier of fact. State v. Evans, 108 S.W.3d 231, 236-37 (Tenn. 2003). The Defendant thoroughly cross-examined the inmate witnesses, as well as presented two rebuttal witnesses to

---

[4] The Defendant argues that the State "flatly reject[ed]" the notion that the Defendant and Mr. Parker worked together by "refus[ing] to prosecute Mr. Parker and [the Defendant] jointly[.]" (Def. Brief pg. 63) However, this argument is a mischaracterization by the Defendant because the record shows that the Defendant successfully defeated a motion for joinder by the State.

- 16 -

testify that one of those witnesses was not credible. However, the jury evaluated the testimony of these witnesses and, nevertheless, accredited their accounts of the Defendant's confessing to shooting the victim while trying to steal her property. The confessions that these witnesses summarized were consistent regarding how and why the shooting occurred.

In the light most favorable to the State, the evidence shows that the Defendant admitted to three people that he shot the victim while trying to steal tools and scrap metal; that the Defendant possessed the murder weapon during the time the victim was killed; and his telephone records showed a decrease in activity during that time period. The evidence is sufficient to support the Defendant's felony murder and second degree murder convictions.

## **CONCLUSION**

Based on the foregoing authorities and reasoning, we affirm the judgments of the trial court.

_____
ALAN E. GLENN, JUDGE