

# IN THE COURT OF CRIMINAL APPEALS
# OF TEXAS

### NO. WR-90,322-01

**EX PARTE CHAD MICHAEL BOUTWELL, Applicant**

### ON APPLICATION FOR A WRIT OF HABEAS CORPUS
### CAUSE NO. 15-116A IN THE 130TH DISTRICT COURT
### FROM MATAGORDA COUNTY

    SLAUGHTER, J., filed a concurring and dissenting opinion in which KELLER, P.J., and RICHARDSON, J., joined.

### CONCURRING AND DISSENTING OPINION

Applicant's continuous-sexual-assault-of-a-child conviction and 99-year prison sentence arose after a jury trial in which the victim, a three-year-old-boy, testified.[1] Also included in the evidence were Applicant's voluntary, non-custodial video-recorded interviews (three of them) to law enforcement, and his qualified written confession. In his

---

[1] The child victim was three years old at the time of the offense and four years old at the time of trial.

application for post-conviction habeas relief, Applicant argues that he is entitled to a new trial because his trial counsel was ineffective for failing to call two expert witnesses, one specializing in child psychology/child forensic interviewing, and one specializing in the Reid Technique of law enforcement interviewing. As addressed below, trial counsel's failure to call these experts in the guilt-innocence phase does not constitute deficient performance and even if it did, Applicant cannot show prejudice. As such, Applicant is not entitled to a new trial on guilt. Applicant is, however, entitled to a new punishment trial based on counsel's failure to put on available mitigating evidence.

Instead of solely granting a new punishment trial, the Court grants Applicant a new trial on guilt. This decision not only fails to defer to the jury's credibility assessment, fails to take into consideration that Applicant's interviews were voluntary and non-custodial, and fails to realize there is no error and no prejudice, but it also needlessly subjects this child victim to the stress and trauma of an entirely new trial. Moreover, by indicating that a trial counsel's failure to call an expert on the Reid Technique of interviewing suspects, used by the vast majority of law enforcement officers for the past 60 years, is *per se* deficient performance, the Court is opening up the floodgates for a tsunami of appeals and post-conviction writs. I, therefore, vigorously dissent.

## I.    Background

In late January 2015, a three-year-old boy, Junior,[2] unexpectedly asked his mother,

---

[2] Junior is the child's nickname.

Ashley, whether their across-the-street neighbor, Chad (Applicant), had a "weenie." This led to Ashley asking him some more questions. As a result, she called the police to report that she believed Applicant sexually assaulted Junior. A police investigation ensued. Sergeant Maria Gomez interviewed Junior's mother (Ashley), Junior, and Boutwell. Junior was also subjected to a Child Advocacy Center interview and a SANE examination.

Junior reported that Chad: (1) put his "weenie" on Junior's tummy; (2) made Junior put his mouth on Chad's penis; and (3) put his finger in Junior's anus. After stating that Chad had put his penis in Junior's mouth, Junior also volunteered the statement that "germs were flying everywhere" and it kind of looked like water coming out of Chad's penis. Sgt. Gomez opined at trial that this was Junior's three-year-old way of describing ejaculation. Junior also said that Chad didn't wash his hands, had "germs" all over his hands, and put the "germs" on Junior's hands. Junior further reported that Chad hurt him "really bad," Junior cried, and Chad gave him a lollipop. In addition to these statements, Junior, while very hard to understand at times with his three-year-old voice, lack of enunciation, and limited vocabulary, seemed to also make some bizarre statements which sounded like (but again were unclear and Sgt. Gomez admitted at trial that she could not understand all of what Junior said): Chad's penis was blue and had a knife at the end of it; when Chad put his "weenie" in Junior's mouth it cut his tongue off; Chad put his whole hand in Junior's mouth; Chad cut Junior's penis; Chad broke his own "weenie" and it came off; and a bug broke Chad's "weenie."

After Sgt. Gomez interviewed Ashley and Junior, she stopped by Applicant's home and asked if he would voluntarily come to the police station to speak with her. He agreed. In all, Applicant voluntarily gave three separate, non-custodial interviews. These interviews, along with testimony and other evidence, were introduced at trial. A summary of the trial evidence is provided below.

**A.      January 30, 2015 – Boutwell's first voluntary, non-custodial interview[3]**

On January 30, 2015, Boutwell voluntarily appeared for his initial videotaped police interview. Although Boutwell was 36 years old, he brought his father with him. At times, Boutwell's father was in the interview room with him.

In this initial interview, Sgt. Gomez informed Boutwell of Junior's allegations which also included Junior stating that Boutwell tried to pull down his 6-year-old sister's pants. Boutwell denied the sexual assault allegations but admitted that Junior and Junior's sister had spent time at his house. He claimed that the kids frequently invited themselves over because they wanted to play with his three-year-old son, Matrix. The interview led to Boutwell becoming very emotional as he confessed that he had been molested as a child. He further talked about his distress over his wife's diagnosis of stage-four cancer and that she was currently on hospice and expected to die soon. Boutwell frequently cried and stated that he is stressed out and cries "like a baby" every day.

---

[3] The first interview recording is over 28 minutes in length. Although only 13 minutes of this interview were published to the jury, the entirety of the video was admitted as an exhibit for the jury's consideration.

Boutwell mentioned getting a lawyer a few times but continued talking. At one point, Sgt. Gomez informed Boutwell that he had an absolute right to get an attorney and that if he wanted one, she would end the interview. Boutwell insisted on continuing with the interview and even offered to take a polygraph. Towards the end of the interview, he also voiced his concern over being arrested and not wanting to "go to a jail cell." Sgt. Gomez informed him that "that's not going to happen today." But she also told Boutwell that if a judge were to issue a warrant, she will have to arrest him. Boutwell responded by asking if she could contact him and give him a chance to turn himself in so that his wife did not have to see him arrested. She agreed that she would give him that opportunity. Boutwell was allowed to return home with no arrest.

**B.      February 10, 2015 – Boutwell's second voluntary, non-custodial interview**[4]

On February 10, 2015, Boutwell agreed to another voluntary interview with Sgt. Gomez. His father sat with him and provided additional input. Boutwell again shared in further detail his experience with being molested as an 8-year-old boy and how at age 12, his uncle also tried to molest him. He stated that after the incident with his uncle, he told his aunt and mother about it which resulted in his uncle beating him mercilessly to get him to recant. The beating was only interrupted by a phone call from an Alvin detective wanting to talk to Boutwell about the trial of the man who molested him and another child when

---

[4] The recording of the second interview is nearly 31 minutes long and was published to the jury in its entirety.

Boutwell was eight.

Then, in early January 2014, Boutwell's uncle called him and apologized for beating him when he was twelve. This phone call triggered an overwhelming emotional response which resulted in Boutwell's downward spiral and his return to drugs.[5] Boutwell indicated that his drug and alcohol use during the January/February 2014 timeframe caused him to experience blackouts.[6] He admitted that if he sexually assaulted Junior, "without a doubt that would have been the time." Boutwell's father added that during that timeframe, he could not seem to get through to his son and the two argued quite a bit.

On several occasions during the interview, Boutwell's father encouraged Boutwell to "open up" so that he could get the help he needed. Towards the end of the interview, Boutwell stated that he could not afford a lawyer. Sgt. Gomez responded by saying that one could be appointed for him. Boutwell then stated, "I want to make a deal. I want to get clean again." Sgt. Gomez responded that she wanted to get Boutwell help, she wanted his family to stay together, and she believed the district attorney could help. At the end of the interview, Boutwell signed a written statement. In the statement, Boutwell provided that he had no recollection of any indecency with a child and that he "didn't do it." But he ended

---

[5] Boutwell discussed struggling with drug addiction and being admitted into mental hospitals on three occasions. These hospital admissions, however, were not related to seeking help for the trauma of being molested. Boutwell stated that until January 2014, he had managed to stay clean for over four years.

[6] But Boutwell also stated that he always waited for everyone to go to bed before he took drugs and then he would go to the front porch to take them.

his written statement with "I need to clean up." He was again allowed to return home without arrest.

**C.    February 12, 2015 – Boutwell's third voluntary, non-custodial interview[7]**

After the February 10th interview, Boutwell's father contacted Sgt. Gomez and asked if Boutwell could meet with her for another interview. She agreed. On February 12, 2015, Boutwell and his father met with Sgt. Gomez for a third time. In this interview, Boutwell wore a large cross around his neck and was again very emotional. He spoke at length about his childhood traumas involving sexual assault and abuse and disclosed that he had even been abused by his own older brother and cousin. He also spoke about his wife's support and how she encouraged him to open up to his dad about being sexually assaulted, which he did. Boutwell's father became emotionally overwhelmed during the conversation, saying that he should have been there to protect his son.

From his interview, one could ascertain that Boutwell intended to confess. He stated, "The sins you commit when you're drunk, you have to pay for when you're sober." He then asked Sgt. Gomez whether she would be calling CPS regarding his kids. He did not seem surprised, and in fact, seemed resigned, when she informed him that she had already spoken to a CPS worker who informed her that she would need to confer with her

---

[7] The video of Boutwell's final interview is just over 45 minutes long. Approximately two-and-a-half minutes of the video were not shown to the jury. But, as with the other videos, it was admitted in its entirety as an exhibit and is part of the appellate record.

supervisor regarding the next step.

Sgt. Gomez also stated to Boutwell, "You're here to, like you said, take responsibility and get this all behind [you]." Boutwell's father also encouraged his son to confess. He told Chad that he needed to "[r]egroup and get yourself together and get some help." Along with Sgt. Gomez, Boutwell's father also told him that even if he couldn't remember the details, his subconscious knew what had happened and even stopped him from doing anything worse.

Sgt. Gomez encouraged Boutwell to confess saying:

Like you've said, that phone call [from your uncle] was the trigger. . . . We're not making excuses, and you haven't once used it as an excuse. . . . This is one more thing you need to get behind you. . . . Like I said, the DA will get with you. They will be more than willing to work with you. I mean I know they are. They're not about putting somebody locked up for years at a time when they're not going to get help there. . . . It could have been worse for a whole lot of kids. I mean you know you're having blackouts . . . you can't control your drug habit . . . we're lucky it wasn't worse than this. . . . You're not the dirtbag you think these other men who messed with you are. . . . Something stopped you from hurting this little boy any worse . . . something stopped you. . . . The polygraph exam showed something. There's something inside you knows. . . . This is where you got to get it out. Right here and it stays right here.

Boutwell interjected that, "I do apologize, I can't say that I remember." But his father responded that "subconsciously" he does remember. To which Boutwell responded, "I remember flashes of things. . . ."

Sgt. Gomez then responded, "I know you're admitting that you believe something happened. You have to know in your heart this is what happened."

Then, in the following exchange, Boutwell affirmatively acknowledged that he sexually assaulted Junior:

> Sgt. Gomez: If you're going to own up to it, own up to it. . . . We've got it down to a time frame where you believe it happened.
>
> Boutwell: Yeah, if that's where it would have . . .
>
> Sgt. Gomez: It's not if it is, is it?
>
> Boutwell: No, that's where it happened. . . . I'd come to the same conclusion as y'all. . . I did screw up . . . .
>
> Sgt. Gomez: You're admitting 'yes, I touched him, yes.'
>
> Boutwell: Yes.
>
> Sgt. Gomez: 'Let's get this shit over with. Yes.'
>
> Boutwell: Yes.
>
> Sgt. Gomez: Is that what you're saying?
>
> Boutwell: Yes.

Boutwell ultimately signed a voluntary, written, qualified confession that acknowledged he was not under arrest nor was he being detained for a crime. The statement provided the following:

> I Chad Boutwell believe that the accusation against me with my neighbor Jr. happened sometime between the last part of January to early part of February 2014. I have blackouts and am taking responsibility for what happened. There is no excuse for what I did. I know that this is the only time that I could have done what I am being accused of.

**D.     Other trial evidence**

In addition to all three of Boutwell's videotaped interviews as well as his written statements, the jury also viewed Junior's videotaped interview with Sergeant Gomez and heard live testimony from Sergeant Gomez, Junior's father (Bradford), the CAC forensic interviewer, the SANE nurse, Junior, and Boutwell's father (Thomas).

### 1. Sergeant Gomez's trial testimony

Sergeant Gomez's trial testimony mainly focused on describing her interviews of Boutwell and Junior. Regarding Sergeant Gomez's interview with Junior, on cross-examination defense counsel focused almost exclusively on Junior's unusual statements and sought to undermine his credibility on that basis. But on redirect, Junior's videotaped interview was admitted into evidence for the jury. Sergeant Gomez concluded that when the interview is viewed as a whole rather than just considering the excised pieces that defense counsel focused on, the jury was afforded a better context for the assault that Junior experienced at Boutwell's hands.

### 2. Bradford's (Junior's father) trial testimony

Junior's father, Bradford, testified that the family moved to the house across the street from Boutwell in 2013, and the two families became friendly. Bradford testified that he would often sit and drink beer with Boutwell. Bradford's two younger children (Jordan and Junior) would play with Boutwell's son, Matrix. Bradford further stated that Boutwell would take the kids for rides on his three-wheeler. Bradford even allowed Boutwell to borrow a car he was not using—he told Boutwell that he would leave the keys in it and

Boutwell could use it when needed. While initially there was a good relationship between the two families, Bradford recalled a strange incident. He testified that on one occasion in 2014, Boutwell borrowed Bradford's car and attempted to pick up Junior from his babysitter's house. Neither of Junior's parents had asked or given Boutwell permission to do this. Thus, Bradford was surprised when the babysitter called him at work to ask if Junior could leave with Boutwell. Bradford instructed the babysitter that his kids were not to leave her house with anyone. He spoke to Boutwell about it later, thought the situation was odd and that Boutwell had crossed the line, but he ultimately brushed it off.

Bradford also testified about instances of Junior's behavior in 2014 that at the time he believed were normal, but now knowing about Junior's accusations, he believed were consistent with the allegations of abuse. These behaviors included: renewed and increased bedwetting, angry outbursts and fighting with his sister with whom he was close, and masturbation. On cross-examination, defense counsel clarified that at the time of these events, the behaviors seemed normal, Bradford thought nothing of it, and he did not seek professional help for his son. Defense counsel also elicited from Bradford that around the time of these behaviors, Junior started a Sunday school class and Pre-K where such changes could have caused the behaviors, or Junior could have been influenced by or learned those behaviors from other children in those settings.

Bradford also recalled a conversation he had with Boutwell the night before Junior outcried to his mother. In the conversation, Bradford was giving Boutwell thoughts on

forgiveness and being able to forgive yourself. Boutwell then asked Bradford whether God could forgive a child molester. Bradford testified that this conversation really stuck in his mind very clearly because the very next day, he learned of Junior's accusations. But on cross-examination, Bradford agreed that Boutwell could have been referring to God forgiving the men that molested him.

### 3. CAC Forensic Interviewer Maria Flores's trial testimony

The CAC forensic interviewer, Maria Flores, testified that Junior told her Chad "put his weenie on my chest and in my bootie and it hurt really bad." Junior also told her that there was blood on Chad's fingers. She used anatomical drawings of a boy and a male teenager to have Junior show her what he meant by each body part he referenced. Junior circled the body parts and Flores wrote down the name by which Junior referred to them. These drawings were admitted into evidence. On cross-examination, defense counsel focused on Junior's more nonsensical statement that a bug broke Chad's "weenie," again, in an attempt to undermine the validity of Junior's accusations.

### 4. SANE Sandra Pardo's trial testimony

The State then called Sandra Pardo, the sexual abuse nurse examiner (SANE). Pardo testified that Junior told her, "Chad touched my butt with his hand on the outside. I told him to stop and he did. He had his clothes off and was shaking his butt. Chad touched my weenie. He cut it." Pardo further testified that she found no physical evidence of trauma or sexual abuse, but that that would be expected for abuse that occurred months earlier. On

cross-examination, defense counsel stressed, and Pardo agreed, that the lack of any physical findings of abuse was also consistent with no history of any abuse. Defense counsel also stressed with Pardo that she only takes down what the patient says but has no idea whether it is truthful or not. Pardo agreed but followed with "[m]ost children don't come up with stories just like that."

### 5. Junior's trial testimony

The State's final witness was Junior, who was four years old at the time of trial. Junior testified that he did not remember everything and his answers to questions reflected that. When asked about what Chad did to him, Junior expressed reluctance to answer and said that he was embarrassed to talk about it in front of all the people. In response, the prosecutor used a drawing of a boy and had Junior circle where the "weenie" was. After the drawing, Junior remained reluctant to answer questions about Chad stating "[i]t's embarrassing me." But he finally testified that he saw Chad's "weenie" one time. He also testified that the abuse he told his mother about happened at Chad's house.

On cross-examination, defense counsel began asking Junior about the bizarre statements he made when he spoke to Sergeant Gomez. He first asked about Chad's penis being blue. Junior testified that it was not blue. Junior also testified that he did not remember saying that Chad put his whole hand in Junior's mouth, nor did he remember saying that a bug broke Chad's "weenie." Junior also testified that Chad did not cut Junior's tongue or "weenie." Junior further testified that he never told anyone that Chad had a "grass

weenie" or that Chad had a knife on his "weenie." After cross-examination, the State rested.

### 6. Defensive evidence – Thomas's (Boutwell's father) trial testimony

The sole witness called by the defense was Applicant's father, Thomas Boutwell. Thomas testified that Junior and his sister used to come over to Applicant's house to play with Applicant's son, Matrix. The visits usually occurred on the weekends when everyone was home from work. Thomas testified that, to his knowledge, Applicant was never alone with Junior or his sister. Thomas also testified about Applicant's out-of-court written statements. Thomas stated that after Applicant initially denied the offense in his first written statement, Sgt. Gomez said "that she could put more charges on him than I could afford to get him out of jail." Thomas explained that Sgt. Gomez "wanted [Applicant] to give a confession. She was wanting him to, you know, own up to what he was . . . being accused of." After that, Applicant returned and gave the second statement in which he gave a qualified confession. Thomas testified that Applicant's concern about Sgt. Gomez's threat to bring "more charges [and] a lot of bail amounts" influenced his decision to give the second statement. Thomas also explained that Applicant was worried that if he were arrested and could not afford bail, he would be in jail while his wife was dying of cancer. On cross-examination, however, Thomas agreed that he had encouraged his son to give the second statement to "get this off his chest" and to get the "help he needs." He also agreed that he did not know whether his son committed the offense and was not with his son every moment, so it was possible that Applicant was alone with Junior at times.

Based on the trial evidence, the jury convicted Boutwell of continuous sexual assault of a child and sentenced him to 99 years in prison. Boutwell appealed based in part on ineffective assistance of counsel alleging that, in the guilt phase, the prosecutor used improper bolstering and defense counsel failed to object. The Thirteenth Court of Appeals rejected Boutwell's arguments and affirmed the conviction, finding defense counsel provided effective assistance. *Boutwell v. State*, No. 13–16–00135–CR, 2017 WL 2875516 (Tex. App.—Corpus Christi July 6, 2017) (pet. ref'd). Boutwell then filed the instant application for a writ of habeas corpus again alleging that his trial counsel was ineffective, but this time basing his claim on defense counsel's failure to call expert witnesses.

## II.     Applicant's habeas claims for Ineffective Assistance of Counsel (IAC) in the guilt phase of trial.

Regarding the guilt phase of trial, Boutwell asserts claims for IAC based on trial counsel's failure to call certain expert witnesses in two general categories: (1) child psychology and forensic interviewing techniques; and (2) the "Reid Technique" widely used by law enforcement interviewers. In support of his claim, Boutwell offered the affidavits of two psychologists—one for each category. Boutwell also offered various articles on the topics at issue.

After a habeas hearing at which defense counsel, Bill Leathers, testified, the habeas court found that Applicant failed to overcome the legal presumption that counsel's actions during the guilt phase amounted to sound trial strategy. Citing *Dannhause v. State*, 928 S.W.2d 81, 86 (Tex. App.—Houston [14th Dist.] 1996, no pet.), it noted, that "[d]efense

counsel need not pursue all available defenses," and may instead "focus on the most viable means of obtaining a verdict in the defendant's favor." Specifically, the trial court noted that Leathers' trial strategy was to demonstrate that the State failed to meet its burden of proof. One such example was to undercut the credibility of the only witness and source of direct evidence—a three-year-old child—by focusing extensively on Junior's nonsensical and bizarre allegations regarding the sexual assault (i.e., that Chad's penis was blue, had a knife on it, and it cut Junior's tongue and penis). The habeas court concluded that "[t]rial counsel effectively focused on the weaknesses in the State's case at every stage." Further, "[t]he fact that the jury believed the child witness beyond a reasonable doubt despite counsel's strategy does not render that strategy or counsel's representation ineffective." The habeas court, therefore, recommended that this Court deny relief as to the guilt phase of the trial. Given the court's conclusion that counsel's performance was not deficient, the habeas court did not hear testimony from the two expert witnesses who had provided affidavits in support of Applicant's claim.

On direct appeal, before the instant writ was filed, the court of appeals reached the same conclusion regarding defense counsel's trial strategy, albeit with regard to a different claim of ineffectiveness.[8] It found that counsel effectively represented Boutwell, noting:

> Throughout the stages of litigation, trial counsel demonstrated his advocacy
> for Boutwell. During pre-trial, trial counsel filed motions in limine and

---

[8] On direct appeal, Boutwell also asserted IAC claims. His claim there, however, was that the prosecutor's closing arguments consisted of improper bolstering to which counsel failed to object. *Boutwell*, 2017 WL 2875516, at *2–3.

motion to exclude or redact video to exclude certain testimonies. At the opening of trial, trial counsel requested a ruling on his motion to exclude witnesses. As the trial progressed, trial counsel sought a jury instruction to keep Boutwell's confession from jury consideration and challenged the State's witnesses through cross-examination. Moreover, defense counsel put forward a witness that provided testimonial evidence supporting his arguments. Counsel demonstrated his advocacy for Boutwell many times throughout litigation, and it is the complete picture of the counsel's representation we must look at in determining whether it was effective. Defense counsel's actions throughout the trial process suggest generally effective representation.

*Boutwell*, 2017 WL 2875516, at *3.

## III.    Analysis of Boutwell's Guilt-Stage IAC Claims

In a case like this where the habeas court's findings are supported by the record, we are supposed to defer to those findings. *Ex parte De La Cruz*, 466 S.W.3d 855, 865–66 (Tex. Crim. App. 2015) (citing *Ex parte Navarijo*, 433 S.W.3d 558, 567 (Tex. Crim. App. 2014)). It is only "[w]hen our independent review of the record reveals that the trial judge's findings and conclusions are not supported by the record [that] we may exercise our authority to make contrary or alternative findings and conclusions." *Ex parte Reed*, 271 S.W.3d 698, 727 (Tex. Crim. App. 2008).

To prevail on an IAC claim, Applicant must show both: (1) that trial counsel's performance was deficient; and (2) that this deficient performance prejudiced his defense. *Wiggins v. Smith*, 539 U.S. 510, 521 (2003). "[T]he proper standard for attorney performance is that of reasonably effective assistance." *Strickland v. Washington*, 466 U.S. 668, 687 (1984). When assessing "reasonably effective assistance," courts must keep in

mind that "[e]ven the best criminal defense attorneys would not defend a particular client in the same way." *Id.* at 689. In fact, "[t]here are countless ways to provide effective assistance in any given case." *Id.* Thus, "[i]t is not our task, [] to undertake an apples-to-oranges-like comparison of 'Trial Strategy No. 1' to 'Trial Strategy No. 2' and determine which strategy we think preferable." *Ex parte Walker*, 425 S.W.3d 267 (Tex. Crim. App. 2014). We must simply and fairly determine whether "counsel's strategic decision was 'reasonable considering all the circumstances'—or, alternatively, whether counsel committed an 'error[ ] so serious that [he] was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment.'" *Id*. In making such a determination, we must keep in mind that "[a] 'fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time' the decision was made." *Id.* (quoting *Strickland*, 466 U.S. at 689); *see also Wilkerson v. State*, 726 S.W.2d 542, 548 (Tex. Crim. App. 1986), cert. denied, 480 U.S. 940 (1987) ("We apply the test as of the time of trial, and not through hindsight."). Our review of counsel's representation must be highly deferential and must presume counsel's actions were sound trial strategy. *Strickland*, 466 U.S. at 689; *Kimmelman v. Morrison*, 477 U.S. 365, 384 (1986) (stating that counsel is presumed to have acted competently).

In addition to overcoming the strong presumption that counsel's actions were sound trial strategy, Applicant must also establish that any such errors by counsel prejudiced him.

In establishing prejudice, "[i]t is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding." *Strickland*, 466 U.S. at 693. "The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694. Applicant must prove both prongs to prevail on an ineffective assistance claim. *See Strickland*, 466 U.S. at 697; *Andrew v. State*, 159 S.W.3d 99, 101 (Tex. Crim. App. 2005).

> **A.** **Applicant cannot overcome the strong presumption that defense counsel's guilt-phase trial strategy was reasonable given the trial evidence, counsel's vigorous cross-examinations, and counsel's focus on reasonable doubt.**

Given the trial evidence, defense counsel exhibited reasonable and sound trial strategy in focusing on the State's burden of proving its case beyond a reasonable doubt. From his opening statement, throughout cross-examination, and through to closing arguments, defense counsel stressed that there was no credible evidence of any sexual assault other than the bizarre and unusual allegations—some of which were clearly false—of a three-year-old boy. There was no physical evidence and no corroboration for Junior's accusations.

On cross-examination for almost every one of the State's witnesses, defense counsel raised Junior's strange and clearly untruthful allegations that: Chad had a grass penis; Chad's penis was blue and had a knife on it; Chad's penis cut Junior's tongue off; Chad cut Junior's penis; a bug broke Chad's penis; Chad broke off his own penis; and Chad put

his whole hand inside Junior's mouth.

When cross-examining Junior's father, Bradford, defense counsel elicited an admission that when Boutwell referred to whether God could forgive a child molester, he may have been referring to the men that molested Boutwell. Bradford also admitted on cross-examination that Junior's behavior such as bed-wetting, angry outbursts, and masturbation seemed very normal at the time. In fact, Bradford admitted that, at the time, he thought nothing of these behaviors and never sought any professional help. Moreover, defense counsel raised the fact that because Junior started attending Sunday school and Pre-K with other children around that same time, such changes and peer influences could have caused the behavior at issue. Bradford agreed with defense counsel's assessment. Further, it is worth noting that before trial, trial counsel was not aware of Bradford's statements about Junior's behaviors of bedwetting, angry outbursts, and masturbation. Thus, counsel had no reason to call an expert on whether such behaviors were indicative of sexual assault.

With both the CAC Forensic Interviewer and the SANE nurse, in addition to stressing Junior's clearly false and bizarre statements, defense counsel stressed that they had never previously met Junior, had no knowledge of whether he was truthful or not, and that it is not their job to determine if Junior's statements were true. He also noted with both of these witnesses that they failed to follow up and get any clarification regarding most of Junior's allegations. Finally, he stressed and received admissions that other than Junior's

statements, there was absolutely no evidence to prove that Junior had been sexually assaulted.

When Junior testified in court, the prosecutor was able to establish very little with the live testimony. Junior was not able to remember much and was embarrassed and reluctant to testify. Junior was able to identify Chad in the courtroom, but otherwise the only live testimony from Junior to support the State's case was that: (1) Junior told his mother "something" that Chad did to him; (2) he talked to a lady with black hair at the police department (Sgt. Gomez); (3) he told his mother some of the "things" Chad did; (4) he saw Chad's "weenie" only one time; and (5) the "things" that happened with Chad happened at Chad's house.

On cross-examination, defense counsel established that: (1) despite Junior telling Sgt. Gomez that Chad's weenie was blue, that was false; (2) Junior did not remember telling anyone that Chad put his whole hand in Junior's mouth or that Chad "broke his weenie" with a bug on it; (4) Chad did not cut his weenie and he did not remember telling anyone that; and (5) Junior did not tell anyone that Chad had a grass weenie or that Chad's weenie had a knife on it.

After the State rested, defense counsel called Thomas Boutwell, Chad's father, as a witness. Through Thomas, defense counsel sought to undermine the validity of Applicant's qualified confessions. Thomas testified that Sergeant Gomez threatened to put so many charges on Chad that he could not afford bail and would be in jail when his wife died. He

testified that based on this, Thomas thought it best for Chad to come in for the third interview because "it might help him." Defense counsel also used Thomas's testimony in an attempt to establish that Chad was never alone at his house with Junior.

Given the weaknesses in the State's case, it was absolutely reasonable for defense counsel to forgo pursuing complicated and often confusing expert witness testimony and instead focus on a simple, straightforward defensive strategy of establishing that there was no credible evidence of any sexual assault and the State failed to meet its burden of proving the case beyond a reasonable doubt. Applicant cannot prove "that his attorney's representation was unreasonable under prevailing professional norms and that the challenged action was not sound strategy." *Kimmelman*, 477 U.S. at 384. Just because this jury chose to believe the child despite the weaknesses in the State's case does not mean that counsel's strategy was unreasonable. Another jury could have easily reached a different verdict. Further, in determining whether counsel was ineffective, we are not allowed to use hindsight in light of a jury's guilty verdict. Nor are we allowed to examine isolated acts or omissions of trial counsel. *Scheanette v. State*, 144 S.W.3d 503, 509–10 (Tex. Crim. App. 2004). The fact that another attorney may have pursued a different strategy at trial or that a judge or judges believe defense counsel should have pursued a different course of action is insufficient to prove a claim of ineffective assistance. *Id.* at 510 (citing *McFarland v. State*, 845 S.W.2d 824, 844 (Tex. Crim. App. 1992), cert. denied, 508 U.S. 963 (1993)). Accordingly, Applicant has failed to meet his burden to establish

deficient performance at the guilt stage.

**B.      Even if counsel erred by failing to call experts, Applicant was not prejudiced because neither of Applicant's proposed experts provided any information that would create a reasonable probability of a different outcome.**

Applicant argues that counsel's performance was unreasonable based on his failure to call: (1) an expert who could have undermined the credibility of the child victim's abuse allegations; and (2) an expert who could have undermined Applicant's confession to police investigators based on coercive interview techniques.[9] As shown above, trial counsel's trial strategy was reasonable such that counsel was not deficient in this respect. But even assuming that there was deficient performance, Applicant cannot show prejudice by proving that there was a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. Moreover, to the extent the Court has determined that such experts could have made a difference at Applicant's trial, it should have first remanded this case to the habeas court to conduct a live hearing with these experts so that the State could have tested their positions through cross-examination, rather than relying on conclusory one-sided

---

[9] The two expert affidavits presented by Applicant are: 1) an affidavit from Dr. Jason Dickinson, a psychologist, opining that the forensic interviews of the victim in this case were "leading and suggestive" and employed tactics "known to elicit false responses from children," and therefore, the victim's statements to investigators "may have been the product of suggestive questioning"; and 2) an affidavit from Dr. Charles Keenan, also a psychologist, opining that the tactics used by the police interviewer in this case were coercive given Applicant's mental-health issues and his extreme emotional distress stemming from his wife's cancer diagnosis, thus resulting in Applicant's statement to investigators being involuntary.

affidavits.

**1.      Dr. Dickinson, the expert that Applicant claims could have undermined Junior's credibility, merely questioned the interview tactics used but did not significantly undermine the credibility of the allegations.**

Applicant claims trial counsel should have called Dr. Jason Dickinson, a psychologist from Montclair, New Jersey, with a doctorate in "legal psychology" who, based on a search of state and federal court cases, has never been qualified by a court as an "expert" witness. Dr. Dickinson claims in his affidavit that the investigative practices used with Junior were confirmatory rather than investigative. He even concluded, without specificity, that the specially-trained and legally-certified CAC Forensic interviewer used interview tactics similar to Sgt. Gomez. He stated that "the further investigators stray from established interviewing practices, the less confidence one can have in a child's testimony," and in a conclusory statement provided: "In this case, the interviewing practices grossly deviated from the generally accepted best-practices." But he also concluded that, "I of course [sic] cannot determine the veracity of the allegations in this case."

Along with other articles, Applicant submitted an article titled "Normative Sexual Behavior in Children: A Contemporary Sample" to support his position.[10] The goal of the underlying study was to determine which sexual behaviors were "normal" behaviors in children ages 2–12. The study was conducted with several hundred parents from Minnesota

---

[10] William N. Friedrich et al., *Normative Sexual Behavior in Children: A Contemporary Sample*, Pediatrics Vol. 101 No. 4 (April 1998).

and Los Angeles County, in which the parents reported observations of their participating children, ages 2–12. The study attempted to screen-out children who had been sexually abused or whom were suspected of having been sexually abused because the belief was that sexually abused children would likely exhibit more sexual behaviors than children who were not sexually abused. "Normal" was defined as a behavior reported in over 20% of the sample group.

In male children ages 2–5 years, the only reported "normal" sexual behaviors were: standing too close (29.3%), touching sex parts in public (26.5%), touching breasts (42.4%), touching sex parts at home (60.2%), and trying to look at people when they are nude (26.8%). The study found that the "less frequent behaviors are clearly the more intrusive behaviors" such as: masturbation (which was a separate category from mere touching of sex parts) (16.7%), putting mouth on sex parts (0.4%), touching adult sex parts (7.8%), and putting items in rectum (0.4%). Abnormal behaviors also included talking about sex acts (2.1%) and knowing more about sex (5.3%).

The article cautioned that "[i]t is important to remember that children's behaviors must be interpreted in light of individual and family variables. The same is true for sexual behavior." The article noted that "mothers with more years of education and who reported their belief that sexual feelings and [sexual] behavior in children were normal, reported more sexual behavior" from their children. It further found that "a more relaxed family attitude regarding nudity or observing sexuality results in children being more likely to

exhibit sexuality."

The article also included the caveat that despite efforts to screen-out sexually abused children from the study, the final sample may contain "sexually abused children whose behaviors inflated" the number of reported sexual behaviors. The article overall suggests that sexually abused children exhibit more sexual behaviors than children who were not sexually abused, and that most "normal" children ordinarily do not exhibit extreme sexual behaviors such as masturbation. In fact, the article concludes that "when a behavior or group of behaviors is very unusual, [it] raises concerns and should be addressed."

Looking at Dr. Dickinson's affidavit in conjunction with the article on "Normative Sexual Behavior in Children," these pieces of evidence do not present a reasonable probability of a different outcome and, in fact, only reinforce the jury's verdict. Dr. Dickinson's affidavit speaks in general terms regarding interviewing and questioning children and how children can "confabulate accounts." He does not specifically address interviewing and questioning children about sexual abuse they may have experienced. His generic criticism of the interviewing techniques used in this case do not rise to the level of creating a reasonable probability of a different outcome. Similarly, the article indicates that boys Junior's age generally do not know about and do not exhibit the behaviors described by Junior in his own words. In other words, even if an interviewer uses more confirmatory practices than investigative ones, a three-year-old male in a home with little to no exposure to sexuality (which other than co-bathing with his father was the case according to

Bradford's testimony)[11] would likely not be able to detail the acts of sexual abuse the way Junior did. For example, in the study only 2.1% of male children ages 2–5 talked about sex acts and only 5.3% knew more about sex. Yet Junior recounted in his own words an incident where Boutwell put his hand in Junior's butt, it hurt, Junior cried, there was blood on Boutwell's hand, a watery substance came out of Boutwell's penis, and then Boutwell gave him a lollipop.

Accordingly, Applicant cannot show a reasonable probability that Dr. Dickinson's testimony and use of the expert study would have had any effect on the jury's verdict. First and foremost, while Dr. Dickinson questioned the interview techniques and opined that they were improper, he did not (and could not) conclude or even suggest that such interview techniques resulted in Junior falsely asserting sexual assault allegations. Moreover, Dr. Dickinson spoke in general terms about interviewing children but did not address interviewing children about sexual assault. And, as mentioned above, the article submitted by Applicant demonstrates that even if "improper" interview techniques were used, the vast majority of three-year-old boys would not know enough about sexual behavior to wholly invent the allegations that Junior made. Had the defense called Dr. Dickinson to testify at trial, the State on cross-examination surely would have questioned him about the ability of

---

[11] Bradford testified that while he sometimes bathed Junior and other times Junior had showered with his dad, Junior never witnessed: (1) anyone, including his parents, engaged in any sex acts or intercourse; (2) anyone, including his father, with an erect penis; (3) anyone masturbating; (4) anyone ejaculating; or (5) pornography or movies involving sex acts. Bradford also testified that during the relevant time period, Junior had never been taught any of these aspects of sexuality.

"normal," non-abused children to describe and discuss sexual behaviors such as the ones Junior described at the time of his outcry. Thus, any expert testimony on this topic would have only marginally helped Applicant's defense by calling into question the interview tactics, but also would have harmed his defensive theory by reaffirming what the jurors likely already knew through common sense—that most children do not know about adult sexual behaviors, and a child's ability to discuss those concepts is abnormal and possible evidence of abuse.

At the end of the day, it was clear that the jury made a credibility determination and, in spite of the issues with certain aspects of his testimony, the jury believed Junior. The jury observed and heard all of Junior's outlandish stories along with the more believable ones, and thus the jury was already well aware of the weaknesses in the State's case. The jury also heard Bradford's account of Boutwell attempting to pick up Junior at the babysitter without his parent's permission. Moreover, the jury witnessed Boutwell's interviews with Sergeant Gomez in which he essentially admitted to sexually assaulting Junior despite then issuing only a qualified written confession. Thus, it cannot be said that there was a reasonable probability based on Dr. Dickinson's generic expert opinion that the jury would have disbelieved Junior and reached a different result. As such, even if counsel was deficient for failing to call experts on investigative techniques of children or children's sexual behavior, it did not prejudice Applicant.

Applicant also argues that trial counsel erred in not calling an expert to testify in

response to Bradford's testimony that Junior's bedwetting, angry outbursts and masturbation indicated normal behavior in a three-year-old. This argument fails to take into account the fact that Bradford's trial testimony was not available to trial counsel in advance of trial. Trial counsel cannot be expected to anticipate trial testimony in advance when there was nothing to indicate it was forthcoming. As such, trial counsel's failure to find and call an expert witness in the middle of trial was not error. Further, trial counsel cross-examined Bradford and had him admit that at the time they occurred, Bradford believed these behaviors were completely normal. In addition, it is common knowledge that bedwetting and angry outbursts (known as "terrible twos" or "terroristic threes") are normal in a typical three-year-old boy, and the jury would have been aware of this fact. And, as indicated by the article submitted by Applicant, masturbation is not a normal sexual behavior in a three-year-old boy.

### 2. Expert on the Reid Technique

Applicant alleges that counsel erred in failing to call Dr. Charles Keenan, a psychologist from Commerce, Texas, who claims by affidavit he would have testified that Sgt. Gomez employed the "Reid Interrogation Technique," which resulted in a coerced and involuntary confession. Notably, Applicant provided no *curriculum vitae* for Dr. Keenan, and at least one appellate court has upheld the trial court's exclusion of Dr. Keenan as an expert witness on an alleged coerced and false confession.[12] I have found no other case

---

[12] In *Ruiz v. State*, No. 11-18-00267-CR, 2021 WL 3235856 (Tex. App.—Eastland July 30, 2021),

where a trial court found Dr. Keenan qualified as an expert on this topic.[13] The lack of a CV and the previous exclusion of Dr. Keenan's testimony regarding a coerced confession calls into question whether he is qualified to testify on this subject, whether he is credible, and whether the trial court would have properly excluded his testimony if he was called as a witness.

Dr. Keenan opines in his affidavit that because of Boutwell's "extreme emotional and psychological distress" and history of mental illness (bipolar disorder and PTSD from childhood sexual abuse), "Boutwell would not be able to maintain reasonable self-interest and be able to knowingly participate in a prolonged interrogation." He concludes by stating

---

Appellant, who was on trial for a non-death-penalty capital murder case, argued that the trial court erred in excluding Dr. Keenan's testimony. Appellant hired Dr. Keenan as an expert to testify in the field of false or coerced confessions. At trial, the State introduced custodial statements made to law enforcement by Juan Castillo, an accomplice witness. Castillo told law enforcement that he was part of the robbery but that he did not kill anyone. He identified Appellant as the person who killed one of the victims. Dr. Keenan was expected to testify that Castillo's statements to law enforcement were a "coerced compliant false confession." The trial court excluded Dr. Keenan's testimony. The court of appeals upheld this exclusion stating that "[b]ecause Dr. Keenan's proposed testimony would not have helped the jury to either understand the evidence or to determine a fact in dispute, we hold that the trial court did not abuse its discretion when it excluded Dr. Keenan's testimony." *Id.* at *10.

[13] The only other case I found mentioning Dr. Keenan involved him testifying as an expert regarding intellectual disability and mental health issues. In *Stevens v. State*, No. 02-18-00497-CR, 2019 WL 6767810 (Tex. App.—Fort Worth Dec. 12, 2019, no pet.), Appellant, convicted of murder, argued as his only issue that the trial court erred in refusing to allow his expert, Dr. Keenan, to testify that his "mental condition left him without the capacity to act knowingly or intentionally." *Id.* at *1. The trial court allowed Dr. Keenan to testify about Appellant's intellectual disability and mental health issues but ruled that he could not testify "to a 'direct connection' to [Appellant's] mental defects or delusions that would negate [Appellant's] criminal intent." *Id.* The court of appeals affirmed, stating that "such testimony is inadmissible in accordance with court of criminal appeals' precedent prohibiting a diminished-capacity defense." *Id.*

that "[t]he interviews are so dramatically egregious that an untrained reasonably intelligent average citizen would be alarmed by the extent of psychological stress, manipulation and deceitful inducements that Sgt. Gomez applies to secure a confession." Notably, Dr. Keenan does not suggest or opine that the "confession" was false, and he conveniently fails to take into account the fact that Boutwell was never detained, in custody, nor compelled by Sgt. Gomez to give any of the three separate interviews. Further, Dr. Keenan fails to take into account that Boutwell had prior experience with the criminal justice system. Before the current charge, Boutwell had previously been charged in seven other misdemeanor and felony cases and had two prior misdemeanor convictions. According to articles submitted by Boutwell, the "Reid Technique" has the most coercive effect when used against juveniles and individuals who are inexperienced with the criminal justice system.

Regarding Dr. Keenan's opinion that Boutwell's emotional state rendered him unable to maintain self-interest when questioned using the Reid Technique, it is clear that that was not the case. Boutwell voluntarily appeared for three separate interviews and was not in custody at any point. He even *sua sponte* volunteered to take a polygraph. Sgt. Gomez never brought Boutwell in for questioning. Sgt. Gomez made it clear that if a judge signed a warrant, she would have to arrest him, but otherwise he was free to leave. During each of the interviews, Boutwell was allowed to have his father right next to him. Boutwell took cigarette breaks when he wanted to. He knew that each interview was video recorded. He also knew he could stop the interview at any time and ask for an attorney. In fact, at one

point, Sgt. Gomez told Boutwell that she was going to stop the interview so he could get an attorney, but Boutwell declined and continued with the interview.

In the first voluntary, non-custodial interview, Boutwell vigorously denies the allegations; steps out of the room and in an incredulous tone tells his father what he has been accused of; proclaims to Sergeant Gomez that having been sexually abused as child himself, he would never touch a child; offers to take a polygraph; and refuses to give a written statement.

*Eleven days later*, with plenty of time to think about it and "recover" from the effects of the Reid Technique, Boutwell appears with his father for a second *voluntary* interview. In this interview, from the very start, Boutwell has adopted a different demeanor. Instead of outright denial, Boutwell claimed he had been experiencing blackouts caused by drug use which was triggered by a personal crisis. He then spoke at length and in detail with great emotion, with very little prompting or input by Sgt. Gomez, about the childhood sexual assault he experienced, about his wife dying of cancer, and mental issues he had experienced over the years, among other things. At the end of the interview which was dominated by Boutwell's unprompted decision to open up about all of his personal crises with very little input or questioning by Sgt. Gomez, Boutwell no longer vigorously denied Junior's accusations. Instead, he maintained in a written statement that he had "no recollection," he "didn't do it," but he needed to "get clean."

Then, two days later, *at the request of Boutwell's father*, Sgt. Gomez agreed to allow

Boutwell to voluntarily come in for a third interview. From the start of this interview, Boutwell's demeanor was again changed. He again had his father with him, wore a large cross, and seemed resigned from the beginning that he was going to confess, would be arrested, and CPS may be taking action. This change in demeanor did not happen as the result of questioning by Sgt. Gomez during the interview; it was there at the start of the interview. In this interview, Boutwell never denied Junior's allegations. He hinted several times that he may not remember what happened or referred to "if" it happened, but through prompting by his father and Sgt. Gomez, he finally confessed that he touched Junior. Despite his verbal confession, Boutwell still qualified his written confession stating that while he experiences "blackouts," he takes responsibility for what happened. Thus, even though Boutwell verbally confessed to touching Junior, he still refused to put it explicitly in writing. This series of interviews shows that Sgt. Gomez's interview techniques did not exploit Boutwell's emotional state to the point that it wore him down and overcame his self-interest. Instead, it was Boutwell's own conscience and hope of avoiding more serious charges that caused him to go back for additional interviews until he was able to confess.

Regarding Dr. Keenan's statement that the "interviews are so dramatically egregious that an untrained reasonably intelligent average citizen would be alarmed" and would realize that Boutwell's confession was coerced and involuntary, Dr. Keenan fails to realize that the jury did view these interviews—nearly 90 minutes of them in total. The jury heard about Boutwell's wife dying of cancer, the sexual and emotional abuse Boutwell

experienced as a child, his ongoing struggles with depression and drug addiction, and his mental hospital stays. They also observed Boutwell's emotional distress during his interviews with Sgt. Gomez. And they heard and observed when Sgt. Gomez did use some questionable interview techniques. Thus, while an expert could have pointed out these techniques and testified that Applicant was emotionally vulnerable to the interviewer's tactics, the jury could reach the same conclusion without any expert testimony. Dr. Keenan even admits to this in his affidavit. By the jury's conviction and 99-year sentence, the jury determined that regardless of any questionable tactics employed by Sgt. Gomez, Boutwell's confession was not a false coerced confession but rather was probative and supported finding him guilty.

In sum, given the lack of credentials for Dr. Keenan, the facts contradicting some of his statements, and the fact that the jury heard and observed the videotaped interviews, there is no reasonable probability that the trial outcome would have been different with Dr. Keenan's testimony (if the trial judge had found him to be qualified). Accordingly, there was no prejudice in trial counsel's failure to call Dr. Keenan, and this Court should not disturb the jury's verdict on this basis.

It is also worth noting that the Court's decision to reverse and remand for a new trial because trial counsel failed to call an expert on the "Reid Technique" is likely to open the floodgates to a tsunami of appeals and writs. The "Reid Technique" articles offered by Boutwell opine that the "Reid Technique" of interviewing suspects may lead to false

confessions. Many of these same articles, however, admit that the Reid Technique has been used as the main interview technique by law enforcement in the United States for over 60 years. While, according to some of the articles, there seems to be a minority of jurisdictions moving away from using the Reid Technique, it is still the primary interview technique taught to and used by law enforcement in the vast majority of jurisdictions to this day. Despite the long-standing and prevalent use of the Reid Technique, Applicant suggests that trial counsel's failure to call an expert to address how the Reid Technique can result in false confessions amounted to IAC. If that's the case, then virtually every time trial counsel fails to call such an expert when a defendant has confessed after being interviewed by law enforcement, he or she has committed IAC. Are we ready to find reversible IAC in all of these cases? That's certainly what we will be tasked with given the current decision by this Court.

## IV.    Conclusion

In viewing defense counsel's trial strategy, not in hindsight in light of a guilty verdict, but at the time counsel made his trial decisions, counsel's actions did not fall below the standard of reasonably-effective assistance. Here, counsel focused on the bizarre and nonsensical statements made by the only witness who could directly testify to Applicant's guilt—a three-year-old boy—and stressed that there was no reliable evidence upon which the jury could find Applicant guilty beyond a reasonable doubt. Both the court of appeals on direct appeal (albeit with respect to a different IAC claim) and the habeas court reviewed

the record and determined that as to the guilt phase of trial, defense counsel rendered reasonably-competent representation. A defendant is entitled to a fair trial, not a perfect trial. *Ex parte Flores*, 387 S.W.3d 626, 634 (Tex. Crim. App. 2012). In light of the evidence adduced at trial, trial counsel relied on a reasonable trial strategy and did not fall below an objective standard of reasonableness by failing to call the proposed expert witnesses.

But even if trial counsel had performed deficiently, a finding of IAC would still require proof that there was a reasonable probability of a different outcome had those experts actually testified at his trial. As addressed above, Applicant has failed to meet this burden of proof.

Dr. Dickinson's testimony was very general with respect to his critique of the interview tactics used in this case, and his opinion was undercut by the article Applicant submitted. And, even despite this article, the jury heard and observed all of Junior's outrageous allegations and chose to believe his more realistic ones instead. Dr. Dickinson's generalized opinion and his ultimate concession that he could not "determine the veracity of the allegations" was unlikely to have any effect on the jury's credibility assessment.

With respect to Applicant's other expert, Dr. Keenan, even assuming that he was qualified to provide testimony here, his opinion that Boutwell's confession was coerced and involuntary was not supported by the record. He does not address the fact that Boutwell gave three separate voluntary and non-custodial interviews over a two-week time period; that Boutwell insisted on going forward with the interview even when Sgt. Gomez tried to

stop it and get Boutwell an attorney; and that he *sua sponte* volunteered for a polygraph. In fact, the third interview was initiated by Boutwell's father. Dr. Keenan's opinion also ignores the fact that Boutwell has had quite a bit of experience with the criminal justice system having had seven prior misdemeanor and felony charges resulting in two prior misdemeanor convictions. Finally, Dr. Keenan's opinion ignored the fact that the jury heard and observed the videos of all three interviews, leaving the jury to make its own evaluation of whether the "interviews [were] so dramatically egregious" so as to alarm the jury "by the extent of psychological stress, manipulation, and deceitful inducements" therein. The jury's guilty verdict and 99-year sentence demonstrate that the jury did not harbor the same concerns as Dr. Keenan about the interview tactics employed. Accordingly, even if trial counsel was deficient in failing to call these experts, such error was not prejudicial.

In closing, I must also dissent from the Court's failure to remand this case for a live habeas hearing. Applicant submitted only affidavits for these experts. Based on the habeas court's finding that trial counsel did not render deficient performance in failing to call the experts, it did not permit Applicant's witnesses to testify at the habeas hearing. Thus, the State was not afforded an opportunity to cross-examine and challenge the experts' qualifications, determine whether and to what degree these experts would have advanced counsel's defense strategy, or whether the expert's testimony would have likely changed the outcome of the case. By relying solely on these affidavits, the Court's decision is based

on impermissible speculation about the weight and credibility of the experts' opinions.

For all the foregoing reasons, I vigorously dissent from the Court's order granting Applicant a new trial. I would instead grant Applicant a new trial on punishment only based on counsel's failure to conduct an adequate investigation for mitigating evidence.

Filed: December 8, 2021
Publish